

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-12-2004

# Lambert v. Blackwell

Precedential or Non-Precedential: Precedential

Docket No. 03-2282

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Lambert v. Blackwell" (2004). *2004 Decisions.* Paper 173.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/173

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT
OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 03-2282, 03-2383

LISA MICHELLE LAMBERT,

Appellant

v.

CHARLOTTE BLACKWELL
(ADMINISTRATOR OF THE
EDNA MAHAN CORRECTIONAL
FACILITY FOR WOMEN);
THE ATTORNEY GENERAL OF
THE STATE OF PENNSYLVANIA

On Appeal from the
United States District Court for the
Eastern District of Pennsylvania
(Dist. Court No. 01-cv-2511)
District Judge: Hon. Anita B. Brody

Argued: January 12, 2004

Before: ALITO, CHERTOFF, and
BECKER, *Circuit Judges*.

(Filed: October 12, 2004)

Peter S. Greenberg, Esquire (Argued)
Nancy Winkelman, Esquire
Jonathan S. Liss, Esquire
Han Nguyen, Esquire
Schnader Harrison Segal & Lewis LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103

*Counsel for Appellant/Cross-Appellee*

Gerald J. Pappert
Attorney General
William H. Ryan, Jr.
Executive Deputy Attorney General,
Criminal Law Division
Amy Zapp (Argued)
Senior Deputy Attorney General,
Capital Litigation Unit
Jerome T. Foerster
Senior Deputy Attorney General,
Appeals and Legal Services Section
Office of The Attorney General
16th Floor, Strawberry Square
Harrisburg, PA 17120

*Counsel for Appellee/Cross-Appellant*

OPINION OF THE COURT

TABLE OF CONTENTS

I.  BACKGROUND . . . . . . . . . . . . . . 3

   A. The Trial . . . . . . . . . . . . . . . . . . 4

      1.  The Commonwealth's Case   5

      2.  Lambert's Case . . . . . . . . . . 9

B. <u>Procedural History</u> . . . . . . . . 14

II. JURISDICTION AND
STANDARD OF REVIEW . . . . . 18

III. DISCUSSION . . . . . . . . . . . . . . . 19

A. Exhaustion . . . . . . . . . . . . . . . . 20

B. Deference . . . . . . . . . . . . . . . . . 23

C. The Merits . . . . . . . . . . . . . . . 34

  1. The Sweatpants . . . . . . . . . 35

    a. Knowing Use of Perjured
    Testimony . . . . . . . . . . 35

    b. "Switching" Evidence . 39

  2. Evidence of Yunkin's
  Location During the
  Murder . . . . . . . . . . . . . . . 42

    a. Knowing Use of Perjured
    Testimony . . . . . . . . . . 44

    b. Suppression of Brady
    Material . . . . . . . . . . . . 49

  3. The "29 Questions" . . . . . . 51

  4. The Crime Scene
  Photographs . . . . . . . . . . . 54

  5. The Dying Declaration . . . 57

  6. The DA's Contact with
  Lambert's Trial Expert . . . 59

  7. The River Search . . . . . . . . 65

    a. Brady Violation
    Concerning the Pink Bag
    and Sneaker . . . . . . . . 65

    b. Knowing Use of Perjured
    Testimony . . . . . . . . . . 67

    c. Brady Violation
    Concerning the Rope . . 68

    d. Destruction of
    Evidence . . . . . . . . . . 69

IV. CONCLUSION . . . . . . . . . . . . 69

CHERTOFF, *Circuit Judge*.

Before us, after a lengthy journey up and down the state and federal justice systems, is the habeas petition of Lisa Michelle Lambert. Lambert is currently serving a life sentence without the possibility of parole for first degree murder. Judge Lawrence Stengel of the Court of Common Pleas for Lancaster County, Pennsylvania imposed the sentence on Lambert after he found Lambert guilty at a bench trial held in July of 1992.

Lambert initially appealed her conviction in the Pennsylvania state courts, which rejected her claims on direct appeal. She thereafter filed a petition for a writ of habeas corpus in federal district court. After holding a hearing over the course of three weeks, Judge Stewart Dalzell of the Eastern District of Pennsylvania found Lambert "actually innocent" and granted her petition. He specifically barred any retrial.

Lambert was released into the custody of her attorneys on April 16, 1997, but her freedom was short-lived. Less than a year later, this Court vacated the District Court's judgment due to Lambert's failure to exhaust her available state court remedies, namely collateral

2

review pursuant to the Pennsylvania Post Conviction Relief Act ("PCRA"). Lambert consequently returned to state court, where a PCRA Court (again Judge Stengel) held a six-week hearing and determined in a comprehensive opinion that relief under the PCRA was not warranted.

After the Pennsylvania Superior Court affirmed the PCRA Court's decision, Lambert not surprisingly re-filed her federal habeas petition. Judge Dalzell held that the state courts' findings were null and void because they lacked jurisdiction to hear Lambert's PCRA petition. He then reinstated his findings from the 1997 habeas hearing and gave the parties a month to request additional testimony on topics that the Court had not addressed in 1997. In the meantime, the Commonwealth sought Judge Dalzell's recusal.

Judge Dalzell eventually acquiesced to the Commonwealth's efforts at recusal, and the case was assigned to Judge Anita Brody of the Eastern District of Pennsylvania. Judge Brody dismissed Lambert's habeas petition after determining, contrary to Judge Dalzell's ruling, that the PCRA Court's findings were not null and void and were entitled to deference under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Lambert now appeals from that judgment.

This case presents a host of sensitive issues. At one level are the very serious allegations of prosecutorial misconduct that Lambert argues require

her release. But important institutional concerns also infuse this case. A state court and a federal court reached diametrically opposed conclusions, and two federal courts took substantially different views of the state court proceedings. This unusual history highlights the need to respect the limits of federal habeas review, as well as the principle of comity that informs that review. Simply put, a habeas court reviews a state conviction to determine whether a state prisoner is in custody in violation of the Constitution or laws or treaties of the United States; the federal court is not mandated to retry the case and substitute its own verdict.

We conclude that the PCRA Court decision here was indeed entitled to deference. After carefully reviewing the entire record and applying that deference de novo, we conclude that the PCRA Court's determinations were well-supported and require that we deny Lambert habeas relief. Put more simply: Lambert's trial was fair, amply supported, and not infected by material error or injustice. We will affirm the denial of the writ by Judge Brody.

I. BACKGROUND

At the center of this contentious case lies the brutal murder of Laurie Show. Show died from knife wounds—stabs to her back and slashes to her throat—inflicted on her by intruders in her home on the morning of December 20, 1991. She was fifteen years old at the time of her death.

3

The investigation of Show's murder quickly zeroed in on three individuals: Lisa Michelle Lambert, Tabitha Faith Buck, and Lawrence Yunkin. The police arrested Lambert and Yunkin on outstanding warrants on the day of Show's murder. Upon questioning, they both admitted their involvement in the attack on Show; and they both implicated Buck.

The Lancaster County District Attorney eventually charged Lambert and Buck with criminal homicide and Yunkin with hindering apprehension.[1] Lambert waived her right to a jury trial, and a week-long bench trial was held before Judge Lawrence Stengel of the Court of Common Pleas for Lancaster County, Pennsylvania.

A. The Trial

It hardly needs to be said that in our adversarial system of justice, the opposing parties—in a criminal case, the prosecution and defense—typically advance two radically different versions of events. This case is no exception.

---

[1] The District Attorney entered into a plea bargain with Yunkin that conditioned the hindering apprehension charge on his giving truthful testimony at Lambert's trial. The Commonwealth revoked the original plea bargain because, as we explain more fully below, it determined that Yunkin was not entirely truthful. As a result, Yunkin eventually pled guilty to third degree murder.

To be sure, the government and defense agreed on broadly what happened: Yunkin and Lambert were romantically involved and lived together, but their relationship entered an eight-day hiatus over the summer of 1991. During those eight days, Yunkin dated Laurie Show.

Lambert and Yunkin eventually resumed their relationship, and there was real animosity between Lambert and Show. So, in July 1991, Lambert devised a plan to enlist the help of several other teenagers to humiliate Show by luring her out of her home, cutting off her hair, and tying her up to a pole within the City of Lancaster. The plan did not come to fruition because two of the girls involved eventually warned Show.

Months later, on December 19, 1991, someone called Laurie Show's mother, Hazel Show, claiming to be her daughter's guidance counselor. The caller scheduled a meeting with Hazel Show for 7 a.m. the following morning at the principal's office of Laurie Show's high school.

The next morning Yunkin, Lambert, and Buck drove to the condominium complex where Show's home was located. They brought with them a knife from Yunkin's and Lambert's home and rope and two black knit hats that Lambert had purchased the previous day at K-Mart. Sometime around 7 a.m., while Hazel Show was out to attend the "meeting" she thought she would have with her daughter's "guidance counselor," Laurie Show was home alone.

Lambert and Buck entered the Show residence. A struggle ensued during which someone stabbed Show and slit her throat.

Lambert, Buck, and Yunkin (whose precise whereabouts during and involvement in the melee with Show, as we explain more fully below, was disputed at trial) drove away from the condominium complex together. The three of them devised an alibi, and Yunkin and Lambert dropped Buck off at school.

Lambert and Yunkin then proceeded to discard evidence from Show's murder. They washed clothes worn during the murder, put them in a bag, and threw them into a dumpster behind K-Mart. They threw a bag containing, among other things, the knife and rope into the Susquehanna River.

Within these general contours, however, the government and defense presented Judge Stengel with diverging versions of what happened. The Commonwealth argued that Lambert hated Show and was deeply involved in the planning and execution of Show's murder. Lambert argued that Yunkin and Buck were to blame and that she tried to prevent them from murdering Show.

Our role is not, of course, to determine the veracity of either account. Rather, we are confined to ascertaining whether any constitutional error occurred at Lambert's trial. Yet the parties' factual contentions at trial provide the necessary framework for understanding Lambert's detailed claims of error. Many of her claims involve allegations that the

government knowingly use perjured testimony and suppressed evidence tending to support her version of events. We therefore relate in some detail the evidence the parties presented at trial and the inferences they urged Judge Stengel to make from that evidence.

### 1. The Commonwealth's Case

The Commonwealth called several witnesses whose testimony tended to show that Lambert hated Show. Several testified that they heard Lambert say numerous times that she wanted to kill Show. Two of Lambert and Yunkin's neighbors swore, for example, that Lambert repeatedly said she wanted to "beat [Show] up" and "get her out of the way and kill her." App. 690, 701.[2] Three witnesses testified that they heard Lambert, on at least one occasion, mention slitting Show's throat.[3]

Several witnesses related incidents involving Lambert and Show that occurred during the months leading to

---

[2] Citations to the Appendix ("App.") refer to the record before Judge Brody. Citations to the Appellate Appendix ("Appellate App.") refer to the appendices the parties submitted on appeal to this Court.

[3] Laura Thomas, Floyd Thomas (Laura's father), and Kimona Warner testified about an incident in the backyard of the Thomas residence where Lambert said she was going to "cut" or "slit" Show's throat. App. 718-19, 739, 757.

5

Show's murder. A number of Lambert's cohorts in the thwarted plan to abduct Show and tie her up to a pole in Lancaster, for example, testified about the plan.

Others testified about physical altercations that occurred between Lambert and Show. Hazel Show testified about an incident that occurred in July of 1991. While Hazel Show was waiting in her car to pick up Laurie from her job at the mall, she saw Lambert grab Laurie and push her into a wall. Hazel Show reported what happened to the police.[4]

Hazel Show also testified that on August 20, 1991, Lambert approached Hazel and Laurie while they were out shopping. Lambert "came up and started screaming and yelling all kinds of obscenities and just being very vicious." App. 827. One thing Lambert screamed was that sexual relations had occurred between Yunkin and Laurie Show during their brief relationship. Hazel Show told Lambert that Yunkin had raped her daughter Laurie, and that they might press charges if Lambert continued to harass Laurie. In fact, Laurie Show had made a report to police on July 31, 1991 that Yunkin had date raped her.

Another altercation occurred in the parking lot of the East Towne Mall on November 22, 1991. Show was in the

parking lot with some friends, including Randy Rodriguez and Jacqueline Weakland. Weakland testified that as they stood talking next to Rodriguez's truck, Lambert — who was pregnant — approached Show and began screaming that Show had ruined her (Lambert) and her (as yet unborn) baby's life. Rodriguez testified that Lambert beat Show's head against the cab of his truck. According to Rodriguez, Lambert said that if she found out Show told the police about the incident she had "friends that would take care of" Show and she would kill Show. App. 777. Weakland also testified that Lambert said she was going to kill Show.

Hazel Show learned what happened and, despite Lambert's threats, reported the incident to the police that same day. The police did not begin to investigate the incident, however, until December 16, 2001. John Bowman, of the East Lampeter Township Police Department, testified that he began by contacting Show and Weakland about the incident. He also called Lambert's parents to try to find her current address, which they were unable to provide to him.

A friend of Yunkin's, Lawrence Lamparter, related an encounter he had with Lambert on December 18, 2001, a couple of days before Show's murder. Lamparter ran into Lambert at the mall. She told Lamparter that the police were looking for her because she had assaulted Show. She also told him that Show was going to charge Yunkin with rape and that "she was going to get Laurie." App. 793.

---

[4] Sergeant Carl Harnish of the Pennsylvania State Police testified that upon her arrest Lambert admitted that she had physically assaulted Show in July of 1991.

The Commonwealth called Yunkin to the stand to testify about the events surrounding Show's murder. Yunkin testified that he drove Lambert to K-Mart the night before the slaying, on December 19, 1991. He waited in the car while she purchased rope and two knit ski hats.

Lambert woke Yunkin up early the next morning. According to Yunkin, Lambert put on a pair of his sweatpants, one of his flannel shirts, and a "jergo" (a hooded sweatshirt). He testified that Lambert often wore his clothes at the time because she was almost seven months pregnant.

They drove to pick up Tabatha Buck, arriving at her house at approximately 6:30 a.m. Yunkin dropped Lambert and Buck off in a wooded area along Oak View Road, a road that ran next to the condominium complex where Laurie Show lived. Lambert told him to go to a nearby McDonald's restaurant, Yunkin testified, and come back in a half hour. Buck told him not to lock the doors because they might have to make a fast getaway.

Yunkin testified that he arrived at McDonald's at 6:50 a.m. and waited for the restaurant to open at 7 a.m. He bought some food when the McDonald's opened and then left to pick up Lambert and Buck. He stayed at McDonald's for approximately fifteen minutes in total.[5]

Lambert and Buck were not present when he arrived to pick them up, so he drove around a little. He passed by their meeting spot on Oak View Road several times before Lambert and Buck showed up and got in the car. As they drove home, Yunkin asked Lambert what happened. She told him "not to worry about it" and that she would "tell [him] later if [he] needed to know." App. 258.

The inhabitant of the apartment below the Shows', Richard G. Kleinhaus, also testified at the trial. Kleinhaus said that he woke up at around 5:45 a.m. on the morning of Show's murder. From his window, he saw Hazel Show leaving the complex. Kleinhaus heard the front door slam above him, followed by a scream and a thump on the floor of the bedroom. Six or eight minutes later, he heard the door slam again. At that time, around ten or twelve minutes after seven o'clock, he looked out the window and saw two people of identical height (approximately 5' 7") exit the stairwell.

The Commonwealth also elicited testimony from Frederick E. Fry, another resident of the condominium complex. Fry testified that at 7:13 a.m. he was waiting in his car while he let the engine idle for a little while. As he backed his car out, Fry saw two individuals to his right. They passed in front of his car as he started forward, and he saw that one was a little shorter and heavier than the other. He

---

[5] A McDonald's employee corroborated Yunkin's testimony. She testified that she served Yunkin between 7

and 7:15 a.m., and he stayed for approximately fifteen or twenty minutes.

estimated that the shorter was approximately 5'3" to 5'5" tall and the taller was approximately 5'5" to 5' 7" tall. He believed, based on his observations, that they were both women.[6]

Hazel Show furnished particularly dramatic testimony. She arrived home at some time between 7:20 and 7:25 a.m., after Laurie Show's guidance counselor never showed up for the fictitious meeting appointment. She found her daughter lying on the floor bleeding, and she yelled to her neighbor downstairs to call 911. There was rope tied around Laurie Show's neck, she testified, so she retrieved a knife from the kitchen to cut it. Laurie Show breathed deeply after the rope was cut, and her mother held and cradled her. Hazel Show asked who had attacked her, and Laurie Show answered "Michelle did it." App. 839. Lisa Lambert was also known by her middle name -- Michelle.

Officer Robin Weaver of the East Lampeter Township Police Department testified that at approximately 7:45 a.m. he and Corporal Jan Fassnacht were the first officers to arrive at the crime scene. Several medical personnel had already arrived, however, and they were attending to Laurie Show. Weaver observed a rope around Show's neck and saw wounds on Show's neck, leg, and hands. He also

found clumps of hair on the floor of the apartment.

Dr. Enrique Penades, the doctor who performed the autopsy on Show, described the wounds he observed and offered opinions as to their cause: several bruises on Show's head from a blunt force; three cuts on her back due to stabs from a knife, one of which penetrated through the right lung; two wounds on her legs, including a cut to her thigh that penetrated to her pelvis; twenty one cuts on her hands, probably due to Show's efforts to grab the knife and hands of her assailant; and a big slashing wound on the throat that was the result of at least three strokes. He testified that the wounds to Show's neck and the deep wound to her back were fatal, and he believed Show was alive not more than a half hour after sustaining the wounds.

Penades also testified that, despite the wounds to Show's neck, he believed she could say "Michelle did it"; "not in a regular tone but a whispering, mumbling, intelligently [sic] enough for someone who is close to this person to understand what [she] was saying." App. 143. Dr. Joseph S. Annese, another expert witness for the Commonwealth, also offered his opinion that Show could speak the words "Michelle did it" despite the wounds she sustained.

Yunkin testified that Lambert and Buck took showers after the three of them arrived home that morning. At that point, Lambert told him that Buck and Show were wrestling and Show accidentally got

---

[6] At the time of their arrest Yunkin stood at 6'1" and weighed 190 pounds, Lambert stood at 5'6" and weighed 143 pounds, and Buck stood at 5'3" and weighed 160 pounds.

8

stabbed in the back, causing a hissing sound as if her lung were punctured. Lambert said that she and Buck agreed to slit Show's throat to put her out of her misery, but she never told Yunkin if they went through with it.

Yunkin testified that he and Lambert washed a bag of clothes that Lambert and Buck had worn that morning and threw them in a dumpster behind K-Mart. Lambert later told him that she needed to get rid of another bag, and he drove her to the Susquehanna River where she threw a bag in. They later returned to the river to get rid of the jergo that Lambert had worn.

Several law enforcement officials testified about finding Lambert, Yunkin, and Buck at a local bowling alley that night and bringing them in for questioning. According to their testimony, Lambert's story changed a few times over the course of questioning. Lambert first told the police the alibi story she, Yunkin, and Buck had devised.

Raymond Solt of the Pennsylvania State Police eventually took over questioning Lambert. After again giving the alibi story, Solt testified, Lambert admitted to him that the story was false. Lambert eventually settled on a version of events in which Buck was largely responsible for Show's murder. Solt and another officer transcribed Lambert's statement, and Lambert ultimately signed it.[7] In the statement, Lambert admitted that it was her idea to go to Show's apartment because she wanted to talk to Show. According to Lambert's statement, Buck went alone to knock on Show's door because Show's mother knew Lambert. Lambert went into the apartment after she heard someone answer and the door shut, and she found Buck struggling with Show. Buck attacked Show with a knife, Lambert told Solt, and she "just stood there" because she "was so scared." App. 470. Eventually, Lambert said, she "couldn't look anymore and I turned away." Id.

### 2. Lambert's Case

Lambert based her case predominantly on her own testimony, during which she admitted several facts tending to implicate her in Show's murder. She admitted to being angry at Show, for example, ostensibly because Show had made up rumors about her in order to create a rift between her and Yunkin. Similarly, Lambert conceded that she had said she wanted to kill Show, but she explained that she only meant it as a figure of speech. She also admitted that on the morning of Show's murder she brought along a bag containing a knife from her apartment, rope, ski hats, and sunglasses. But Lambert brought these with her, she testified, because she and Yunkin planned on going to cut down a Christmas tree later in the day. The ski hats—which

---

[7] Lambert testified at trial that the written statement accurately reflected what she told Solt.

9

Lambert admitted to purchasing from K-Mart the night before, along with the rope—were intended to keep wood chips out of their hair. They needed the knife to cut the small branches off the base of the tree so it would fit into the stand. The sunglasses were necessary to prevent them from getting pinkeye. And the rope was for tying up the tree; indeed, Lambert testified that she purchased that particular rope because it contained a picture of a man dragging a Christmas tree on its packaging.

Despite these seemingly inculpatory admissions, Lambert maintained that it was Yunkin and Buck who developed the plan to attack Show and she only learned of the plan the day before the attack. Moreover the plan, as far as she knew, never involved murdering Show.

During the week leading to Show's murder, Lambert testified, Yunkin repeatedly told her and Buck that he was nervous that Show was going to press rape charges against him. Yunkin and Buck told Lambert that they had a plan to "get" Show that would "keep her mouth shut." App. 1037. But they would not tell her exactly what their plan was.

The night before Show's murder, Lambert and Yunkin went to Buck's house. There, Yunkin again expressed his fear that Show would put him in jail by accusing him of rape. Buck and Yunkin then told Lambert about their plan.

They had decided to go to Show's house, knock on her door, pull her outside, and beat her up enough to put her in the hospital. Buck explained that she had called Hazel Show and set up a fake meeting with Laurie Show's guidance counselor so that she would not be there when they came to attack Show.

Lambert told them that it was a "stupid" plan because Yunkin would get into almost as much trouble for beating up Show as he would for the rape charge. She also told them that she did not want to be involved in beating up Show because (at least she believed) Show was pregnant. As a result, Lambert suggested they do what they had planned on doing the previous summer: cutting off Show's hair and humiliating her.

Buck and Yunkin eventually agreed, and the three of them settled on accosting Show as she left her apartment and cutting her hair off. Thus, Lambert testified, she put a pair of scissors in the bag containing the tools for cutting down the Christmas tree: the knife, ski hats, and rope.

Yunkin and Lambert picked up Buck early the next morning. During the car ride to Show's home, Buck looked through the bag containing the knife, ski hats, and rope and found that the scissors were missing. Buck told Lambert that they could use the knife instead of scissors, and she cut off a piece of her own hair to demonstrate. Buck also cut off a piece of the rope, explaining that they could use it to tie Show's hands and feet together.

Yunkin developed a cough as they approached the entrance to Show's

10

condominium complex, and he decided to go to McDonald's to get a drink. Lambert and Buck went on to Show's apartment without him; Buck carried the knife and rope.

The two of them waited for Show at the bottom of the stairway that led to the floor where her apartment was located. Buck became cold and decided to go and ask Show what was taking her so long. Lambert heard Buck and Show talking. Then, Lambert testified, she heard some scuffling and the door slam.

Lambert called Buck but Buck did not answer, so she climbed the stairs and entered Show's apartment. She found Buck hitting Show on the floor. Lambert grabbed Show's ankles and told her to calm down because they just wanted to talk to her. Show freed herself and ran into the adjacent room, her bedroom. Buck followed after her.

It was then, Lambert testified, that Buck took out the knife. Lambert told Buck to put the knife away, because she saw a pair of scissors they could use to cut Show's hair instead. But Buck did not listen and, after pulling Show down, began to hack at Show's hair with the knife.[8]

Lambert tried to rescue Show from Buck. First she tried to pull Buck away

from Show, but the knife (which she saw "bounce" off Show's back) came close to her face. Next, she pulled Show away from Buck. At that point, she heard a "whooshing" sound (due apparently to a puncture in Show's lung) and saw blood on her hands. Lambert was afraid of blood; her knees went out from under her and she fell to the floor shaking.[9]

Lambert began to crawl to the bedroom door. Show pleaded with Lambert not to leave her there, however, so Lambert grabbed Show by the wrist and pulled her toward the front door. But as Lambert stepped outside the apartment, still holding onto Show, Buck pulled Show back into the apartment.

Lambert continued to flee the apartment. After she descended a couple of steps, however, she collided with Yunkin. Yunkin shook her and asked what happened to her hands. She told him that Buck stabbed Show. Yunkin exclaimed "Oh, fuck," took Lambert to the bottom of the stairs, told her to sit there, and bounded up the stairs toward Show's apartment. As she waited, Lambert heard Yunkin yell "You fuck'n bitch," and "Your ass is done now, bitch."[10]

---

[8] The defense offered testimony that pieces of Show's hair were found at the crime scene, and an expert testified that the hair was cut off using a knife.

[9] In addition to Lambert's testimony, the defense offered the testimony of a doctor and nurse from the hospital where Lambert gave birth to her child that tended to show Lambert was afraid of blood.

[10] Lambert offered as evidence of Yunkin's presence in Show's apartment a

Lambert eventually heard the front door slam. Yunkin bounded down the stairs and told Lambert he was going to get the car; Buck followed, with blood on her clothes and the knife in her hands. She stared at Lambert, and Lambert retreated. Yunkin yelled "Tabby! Get her!" and Lambert began to run.

Lambert did not know where she was running, but she eventually came out along a road. Yunkin sped out of the condominium complex and picked up Lambert and Buck. Yunkin was saying "Oh, shit!" because he had passed Hazel Show as he was driving out of the condominium complex and she had looked right at him. He then pushed Lambert's head down because they were passing Show's school bus.

The three of them drove to Lambert and Yunkin's home. Buck and Yunkin put their bloody clothes in the trash can. A dispute arose over whether Show was dead and, if so, who had killed her. Yunkin said that Buck had killed Show. Buck said that Show was dead, but she was not sure whether she or Yunkin had killed her.

Eventually, Yunkin and Lambert met with Buck again and refined their alibi story. They also came across a newspaper that contained news of Show's death. Upon learning the news, Lambert testified,

_____

pearl earring found in the apartment. Yunkin testified that it was Lambert's earring but he had also worn it on occasion (about three times).

Yunkin and Buck sang a mocking song and laughed hysterically.

Lambert admitted that upon her arrest she told the police at least two false versions of what happened, the alibi story and the version in which Buck was solely responsible for Show's murder and Yunkin had little involvement. She told the police the latter story because Yunkin was afraid of going to prison for the rest of his life and he told Lambert that she would receive less time because she was a pregnant woman. As a result, she agreed to cover up Yunkin's involvement.

To support her case, Lambert also relied (in addition to her own testimony) on expert testimony concerning Show's death, evidence tending to show that Yunkin had violent propensities, and a document that allegedly passed between her and Yunkin while they were both in prison awaiting trial. The document was comprised of twenty-nine questions posed by Lambert to Yunkin with answers inscribed next to them. It contained, for example, the following:

> 6) [Question:] I don't understand! Why not tell about Laurie? Are you afraid you couldn't? Did she look scary dead—like Tressa? I want to go home and have my baby twins! What if one of them dies because they need Mommy? I don't want to cover up for you. I never should have agreed, and I'm mad, and

still sad! [Answer:] Yes and Yes.

7) [Question:] It's not my fault that things went wrong (our prank) Friday morning! Do you even care? I still blame you and Tabby! [Answer:] Just wish it didn't happen.

. . . .

10) [Question:] I know I'm not an angel, but, Lawrence, I never get mad enough to kill! Your temper blew, [and you] hurt her, this time so bad that she can't get better. To me, it's a surprise it was on her, and she will never live again! I wanted to get god-damn Tabby away from her, [you] got in the bedroom and blew up [and] went decided to do things your way—violent! That should've been me that you killed. I hate you! [Answer:] I don't hate anyone. God said, it is wrong to hate.

PCRA Decision (attachment). Yunkin admitted, upon cross examination, that he and Lambert had passed a document back and forth through the prison law library in which he answered questions that she asked. He testified, however, that the document presented to him at trial, the "29 Questions," appeared tampered with and different from the document he recalled exchanging with Lambert. App. 321. He claimed, for example, that he had never seen the sixth question or tenth question.

Yunkin testified that in the document that passed between him and Lambert, Lambert had written the questions in pencil and he had written all his answers in pencil and then traced over every other word in ink so that they could not be changed. But Lambert's expert testified that there was no indication of any pencil writing on the 29 Questions, and the questions and answers were written with two different pens. After the Commonwealth had an expert from the Pennsylvania State Police crime lab examine the document, Lambert and the government entered into a stipulation that there were no erasures or graphite on the document. The Commonwealth conceded that if its expert were called to the stand, he would essentially agree with Lambert's expert.

To bolster her argument that the 29 Questions showed it was Yunkin who murdered Show, Lambert elicited testimony that Yunkin was a violent individual. Yunkin himself testified that he had hit Lambert three times, though he said it was accidental all but once. And Lambert testified that Yunkin wanted to fight an individual named Brad Heiser, Show's boyfriend at the time of her death.

Lambert also called experts to testify to the circumstances surrounding Show's death. John C. Balshy, a crime scene expert, testified that the letters "T" and "B" appeared written in blood on the

13

door next to where Show's body lay when she died. He opined that Show leaned over and wrote the letters to identify Tabatha Buck as her assailant.

Lambert also offered expert testimony tending to show that Show could not have said "Michelle did it" because she was probably unconscious and, in any case, physically unable to articulate those words. Dr. Isidore Mihalakis testified that, given Show's wounds, she would have become unconscious "considerably less than a half hour" after sustaining her injuries. App. 388. Moreover, Dr. Mihalakis testified that the wounds to Show's throat would have hindered her ability to speak. He also testified that it was "extremely unlikely" that a female could have wielded the knife with enough strength to break the tip off, as had happened to the knife used to kill Show.

## B. Procedural History

Before resting her case, Lambert moved for a mistrial due to prosecutorial misconduct. She argued, among other things, that the Commonwealth knowingly elicited perjured testimony from Yunkin regarding the 29 Questions. The Court denied Lambert's motion and, on July 27, 1992, found Lambert guilty of first degree murder and criminal conspiracy to commit murder.[11]

---

[11] The Court also rejected Lambert's demurrers, made after the Commonwealth rested its case, in which she argued that the Commonwealth had

The sentencing phase ensued, and Judge Stengel declined to impose the death penalty. Instead, he sentenced Lambert for first degree murder to a statutorily mandated term of life imprisonment without the possibility of parole.

The next day, Lambert filed a set of motions for arrest of judgment and a new trial. Among her many arguments was that the Commonwealth had offered insufficient evidence to sustain the verdict. Judge Stengel denied Lambert's motions in a comprehensive opinion.

In the opinion, the Court extensively canvassed the evidence at trial and its factual findings. "The physical findings at the crime scene, the testimony at trial of the defendant, the trial testimony of Hazel Show, the history of ill will between the defendant and the victim and the circumstantial evidence developed at trial," the Court held, "all lead to the conclusion that defendant was guilty of the murder of Laurie Show." App. 1628-29.

Further, the Court held that the evidence that, according to Lambert, tended to show she did not murder Show—such as the 29 Questions—was insufficient to create a reasonable doubt as to her guilt. With respect to the 29 Questions, the Court found that "[a]t best, the questionnaire was inconclusive," and "[t]o simply say that the questionnaire

---

failed to offer sufficient evidence for a conviction.

14

could not be fully and satisfactorily explained does not mean that it created reasonable doubt." App. 1629-30.

Lambert subsequently obtained new counsel and filed a second set of post-verdict motions on October 3, 1994. She based her request for relief on claims of after-discovered evidence and her trial counsel's ineffectiveness.[12] After holding a hearing, Judge Stengel again denied Lambert's post-verdict motions in another comprehensive opinion dated March 14, 1995.

In the decision, the Court concluded that "[t]rial counsel's representation of Lisa Michelle Lambert was professional, diligent, and thoughtful." App. 2076. With respect to the alleged "after-discovered evidence"—evidence that the Commonwealth revoked Yunkin's plea

_____

[12] The trial court entertained Lambert's second post-verdict motion because of a "loophole" that defense counsel, the prosecution, and the Court intentionally created to "accommodate" Lambert. Specifically, the Court sentenced Lambert only on the first degree murder charge even though she had also been convicted of criminal conspiracy. As a result, the appeal period from a judgment of conviction from the criminal conspiracy charge had not expired. The parties (and the Court) apparently agreed that this allowed Lambert to introduce new evidence and seek a new trial. See App. 2038; PCRA Decision 7 n.6.

agreement (in which he agreed to plead guilty to hindering apprehension) and Yunkin agreed to plead guilty to third degree murder because the Commonwealth determined that he was not fully truthful at trial—the Court explained:

This issue boils down to whether Mr. Yunkin's testimony at the Lambert trial was credible. Mr. Yunkin testified that he was not present in the Show condominium at the time of the killing. The testimony of independent witnesses would seem to establish that he was truthful in this regard. A manager at a nearby McDonald's saw him at or about the time of the murder, which supported his story that he dropped Ms. Lambert and Ms. Buck off along the road near the Show residence and then went to McDonald's for breakfast.

Mr. Yunkin's story that he was not present at the time of the killing was also supported by the neighbors who saw two figures of about the same height walking together across a large grassy area from the Show residence toward the road. By height and build they matched,

15

generally, a description of Ms. Lambert and Ms. Buck. Mr. Yunkin is significantly taller than either of those two women and the witnesses testified that the two figures seen walking across the grassy area were of about the same height, that being in the 5'1" to 5'5" range. Therefore, on the subject of whether Mr. Yunkin was in the Show residence at the time of the killing, Mr. Yunkin would appear to have been truthful. At least, his story was supported by independent witnesses.

App. 2073. Yet "[a]s to whether Mr. Yunkin was aware of the plan to do harm to Ms. Show," the Court explained, "he was decidedly incredible on this issue." Thus the Court held that the "after-discovered" evidence (Yunkin's plea to third degree murder) would not have had any material effect on the outcome of the case because the facts adduced at trial were fully consistent with his plea.

Lambert appealed from the judgment denying her second set of post-verdict motions. The Pennsylvania Superior Court affirmed the trial court's judgment, and Lambert filed a petition seeking allocatur from the Pennsylvania Supreme Court. The Supreme Court denied Lambert's petition on July 2, 1996.

Lambert filed a *pro se* petition for a writ of habeas corpus in federal district court on September 12, 1996. The case was assigned to Judge Dalzell, who appointed counsel to represent Lambert and directed counsel to file an amended petition.

The subsequently-filed amended petition advanced numerous grounds for relief, including claims that Lambert had not previously advanced in state court. The Commonwealth objected to Lambert's petition, arguing that she had failed to exhaust her state court remedies and had committed insurmountable procedural default.

Judge Dalzell deferred consideration of the Commonwealth's exhaustion argument while, in the meantime, permitting broad discovery and conducting a fourteen-day evidentiary hearing. At the end of the hearing, the District Court entered an order granting Lambert's petition for a writ of habeas corpus, releasing Lambert from prison, and barring the Commonwealth from retrying her. In an Order and Memorandum Opinion that it issued a few weeks later, on April 21, 1997, the Court offered several bases for its conclusion that the habeas statute's exhaustion requirement did not preclude the Court from granting Lambert's petition. See Lambert v. Blackwell, 962 F. Supp. 1521, 1553-55 (E.D. Pa. 1997).

This Court vacated the District Court's judgment, however, and found that Lambert's failure to exhaust available

16

state court remedies required the District Court to dismiss her petition without prejudice. We held that Lambert had not pursued her remedies under the PCRA for some of her claims and her habeas petition therefore contained both exhausted and unexhausted claims. Thus the Supreme Court's decision in Rose v. Lundy, 455 U.S. 509 (1982), required the District Court to dismiss such a "mixed petition." See Lambert v. Blackwell, 134 F.3d 506 (3d Cir. 1998).

Lambert filed a PCRA petition on February 2, 1998 in the Court of Common Pleas for Lancaster County.[13] Lambert presented 257 claims for relief in the PCRA Court: 157 allegations of prosecutorial misconduct, 72 allegations of after-discovered evidence, and 28 allegations of ineffective assistance of counsel. The PCRA Court held eight weeks of hearings and, on August 24, 1998, issued a 322-page opinion in which it denied Lambert's petition for relief.

Lambert filed an appeal with the Pennsylvania Superior Court, and the Superior Court affirmed the judgment of the PCRA Court on December 18, 2000. See Commonwealth v. Lambert, 765 A.2d 306 (Pa. Super. 2000). Before addressing the merits of Lambert's appeal, however, the Superior Court raised *sua sponte* the timeliness of Lambert's PCRA petition.

The PCRA requires petitions to be filed "within one year of the date the judgment becomes final," except in certain statutorily defined circumstances. See 42 Pa. Cons. Stat. § 9545(b). Lambert filed her petition approximately sixteen months after her judgment of conviction became final. It appears that the parties did not raise the statute of limitations as an issue in front of the PCRA Court, however, and the Court did not address it.

The Superior Court determined that, based largely on the Pennsylvania Supreme Court's interpretation of the PCRA in Commonwealth v. Fahy, 737 A.2d 214 (1999), Lambert's PCRA petition was untimely.[14] The Superior Court decided to review the merits of the PCRA Court's decision, however, because "the Third Circuit Court of Appeals, the PCRA court, the Commonwealth and counsel did not have the benefit of" the Pennsylvania Supreme Court's decision in Fahy (which was decided on August 27, 1999, about a year after the PCRA Court

---

[13] The Court of Common Pleas Judge who presided over the 1992 bench trial, Judge Lawrence Stengel, also presided over the PCRA proceedings.

---

[14] We opined in our decision directing the District Court to dismiss Lambert's petition without prejudice that Lambert's PCRA petition could be timely for either of two reasons—by operation of Pennsylvania's transfer statute, 42 Pa. C.S.A. § 5103, or any of the three statutory exceptions to the PCRA's statute of limitations, 42 Pa. C.S.A. § 9545(b)(1). See 134 F.3d at 522-24. The Superior Court rejected each of these possibilities.

17

issued its decision).[15] After reviewing Lambert's petition on the merits, the Superior Court affirmed the judgment of the PCRA Court. 765 A.2d at 363.

Lambert did not petition the Pennsylvania Supreme Court for an allowance of an appeal from the Superior Court's judgment. Rather, she filed an amended petition for a writ of habeas corpus in federal district court on January 29, 2001.

The case again came before Judge Dalzell, who determined that the proceedings before the PCRA Court and Superior Court were null and void, and therefore entitled to no deference, because those courts had no jurisdiction over Lambert's PCRA petition due to its untimeliness. See Lambert v. Blackwell, 175 F. Supp. 2d 776, 786-87 (E.D. Pa. 2001). Accordingly, the District Court reinstated its findings of fact and conclusions of law from its earlier decision granting Lambert's petition for a writ of habeas corpus, and the Court gave the parties approximately a month to notify it if they sought additional discovery and a hearing. Id. at 791.

On January 18, 2002, however, Judge Dalzell gave way to the

---

[15] In Fahy the Pennsylvania Supreme Court held that since the PCRA's time limits are jurisdictional, and not a mere statute of limitations, the filing period can only be extended as permitted by the statute and equitable principles such as tolling cannot apply. 737 A.2d at 222.

Commonwealth's fourth motion seeking his recusal. See Lambert v. Blackwell, 205 F.R.D. 180 (E.D. Pa. 2002). Lambert's petition was consequently transferred to Judge Anita Brody of the Eastern District of Pennsylvania. After holding a hearing on the Commonwealth's motion to dismiss, Judge Brody denied Lambert's petition and dismissed it with prejudice.

Judge Brody concluded that, contrary to Judge Dalzell's previous decision, the PCRA Court's determinations were not null and void and were entitled to deference under AEDPA. After reviewing Lambert's claims accordingly, Judge Brody concluded that they were without merit. The District Court granted Lambert a certificate of appealability, and Lambert timely appealed. The Commonwealth also timely filed a cross-appeal.

## II. JURISDICTION AND STANDARD OF REVIEW

The District Court exercised jurisdiction under 28 U.S.C. § 2254, and the District Court's order dismissing Lambert's habeas petition is a final decision for purposes of 28 U.S.C. § 1291. Yet Lambert must surmount an additional hurdle before we can properly exercise appellate jurisdiction over her appeal. We only have jurisdiction if this Court or a District Court has properly issued a certificate of appealability pursuant to 28 U.S.C. § 2253(c). See United States v.

18

Cepero, 224 F.3d 256, 261-62 (3d Cir. 2000) (en banc).[16]

A COA may issue only upon "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). If "a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000). In addition, a COA must "indicate which specific issue or issues satisfy" that standard. 28 U.S.C. § 2253(c)(3).

Here, the District Court failed to specify which of the voluminous issues Lambert raised in her habeas petition satisfy the standard for issuance of a COA. The Court concluded: "Although in very different contexts, two federal judges have examined the claims of the petitioner Lambert and have reached different outcomes. Accordingly, a COA will be GRANTED." Lambert v. Blackwell, 2003 WL 1718511, at *56 (E.D. Pa. April 1, 2003).

In the ordinary course, we would remand to the District Court to clarify its order to comply with the specificity requirements of 28 U.S.C. § 2253(c)(3). See Szuchon v. Lehman, 273 F.3d 299, 311 n.5 (3d Cir. 2001). Where the parties have fully briefed the substantive issues before bringing to our attention that the COA was inadequately specific, however, this Court has viewed the District Court's certificate as a nullity and construed the petitioner's notice of appeal as a request for us to issue a COA. Id. We follow that course here.

Lambert has raised several issues on appeal. On each issue, two federal district court judges—albeit in different procedural postures—reached differing conclusions as to whether constitutional error at trial warranted granting habeas relief. As to each of these issues, which we discuss seriatim below, we will grant a COA. Because the District Court relied exclusively on the state court record and did not hold an evidentiary hearing, our review is plenary. See Moore v. Morton, 255 F.3d 95, 103 (3d Cir. 2001).

III.    DISCUSSION

Lambert and the Commonwealth raise numerous issues in their cross-appeals and offer several arguments, often in the alternative, supporting their respective positions. We first address the Commonwealth's arguments that we

---

[16] Only Lambert's appeal must satisfy the certificate of appealability standard. See Fed. R. App. P. 22(b)(3) ("A certificate of appealability is not required when a state or its representative appeals."); Lambert v. Blackwell, 134 F.3d at 512 n.15. We exercise jurisdiction over the Commonwealth's cross-appeal under 28 U.S.C. §§ 1291 and 2253. The Commonwealth challenges certain of the District Court's legal conclusions, over which we exercise plenary review. Id. at 512.

cannot reach the merits of Lambert's claims and must dismiss her petition for procedural reasons. We have already rejected one of those arguments, that we lack jurisdiction because Lambert's claims do not warrant the issuance of a certificate of appealability. For the reasons explained below, we also reject the Commonwealth's argument that Lambert failed to exhaust her available state remedies because she did not seek allocatur from the Pennsylvania Supreme Court to appeal from the Superior Court's judgment affirming the PCRA Court's dismissal of her PCRA petition.[17]

We next address Lambert's arguments regarding the amount of deference we must afford the state courts' determinations in the PCRA proceedings. We conclude that we must defer to the state courts' determinations, and we apply that deference to Lambert's claims.

### A. Exhaustion

A state prisoner must exhaust his state court remedies before a federal court may grant him habeas relief. The Supreme Court first articulated this requirement in Ex parte Royall, 117 U.S. 241 (1886), and

---

[17] The Commonwealth also argues that if we accept Lambert's argument that the PCRA proceedings are null and void, we must dismiss her petition as untimely. As we describe below, we find that the PCRA proceedings are not null and void. The Commonwealth's timeliness argument is therefore moot and we need not address it.

it is now codified at 28 U.S.C. § 2254(b)(1). That provision states:

> (b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that—
>
> (A) the applicant has exhausted the remedies available in the courts of the State; or
>
> (B)(i) there is an absence of available State corrective process; or

(ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1). The statute further provides that "[a]n applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented." 28 U.S.C. § 2254(c).[18]

---

[18] Yet "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2).

The exhaustion doctrine "turns on an inquiry into what procedures are 'available' under state law." O'Sullivan v. Boerckel, 526 U.S. 838, 847 (1999). And the Supreme Court has declined to interpret the "any available procedure" language of § 2254(c) to require "a state prisoner to invoke *any possible* avenue of state court review." Id. at 844 (emphasis in original). Thus "state prisoners do not have to invoke extraordinary remedies when those remedies are alternatives to the standard review process and where the state courts have not provided relief through those remedies in the past." Id. (citing Wilwording v. Swenson, 404 U.S. 249, 249-50 (1971) (per curiam)). "Section 2254(c) requires only that state prisoners give state courts a *fair* opportunity to act on their claims." Id. (emphasis in original).

In O'Sullivan, the Supreme Court held that a petitioner must seek review in the Illinois Supreme Court in order to satisfy the exhaustion requirement even though the court's review is discretionary. The Court found that review in the Illinois Supreme Court was a "normal, simple, and established part of the State's appellate review process." 526 U.S. at 845. As a result, the petitioner had to seek review in order to give the state courts a "full opportunity to resolve any constitutional claims." Id. In other words, "the creation of a discretionary review system does not, without more, make review in the Illinois Supreme Court unavailable." Id. at 848.

The Court took pains, however, to state that "there is nothing in the exhaustion doctrine requiring federal courts to ignore a state law or rule providing that a given procedure is not available." Id. at 847-48. Justice Souter interpreted this statement as leaving

> open the possibility that a state prisoner is [] free to skip a procedure even when a state court has occasionally employed it to provide relief, so long as the State has identified the procedure as outside the standard review process and has plainly said that it need not be sought for the purpose of exhaustion. It is not obvious that either comity or precedent requires otherwise.

Id. at 850 (Souter, J., concurring); see also id. at 861 (Stevens, J., dissenting); id. at 864 (Breyer, J., dissenting). As an example, Justice Souter pointed to the following pronouncement from the South Carolina Supreme Court:

> [I]n all appeals from criminal convictions or post-conviction relief matters, a litigant shall not be required to petition for rehearing and certiorari following an adverse decision of the Court of Appeals in order to be deemed to have exhausted all available state remedies respecting a claim of error.

21

Rather, when the claim has been presented to the Court of Appeals or the Supreme Court, and relief has been denied, the litigant shall be deemed to have exhausted all available state remedies.

In re Exhaustion of State Remedies in Criminal and Post-Conviction Relief Cases, 471 S.E.2d 454 (S.C. 1990).

The Pennsylvania Supreme Court, apparently taking its cue from Justice Souter's concurrence, issued the following order on May 9, 2000:

[W]e hereby recognize that the Superior Court of Pennsylvania reviews criminal as well as civil appeals. Further, review of a final order of the Superior Court is not a matter of right, but of sound judicial discretion, and an appeal to this court will be allowed only when there are special and important reasons therefor. Pa.R.A.P. 1114. Further, we hereby recognize that criminal and post-conviction relief litigants have petitioned and do routinely petition this Court for allowance of appeal upon Superior Court's denial of relief in order to exhaust all available state remedies for purposes of federal habeas corpus relief.

In recognition of the above, we hereby declare that in all appeals from criminal convictions or post-conviction relief matters, a litigant shall not be required to petition for rehearing or allowance of appeal following an adverse decision by the Superior Court in order to be deemed to have exhausted all available state remedies respecting a claim of error. When a claim has been denied relief in a final order, the litigant shall be deemed to have exhausted all available state remedies for purposes of federal habeas corpus relief. This Order shall be effective immediately.

In re Exhaustion of State Remedies in Criminal and Post-Conviction Relief Cases, No. 218 Judicial Administration Docket No. 1 (Pa. May 9, 2000) ("Order No. 218"). Several Pennsylvania district courts have held that due to Order No. 218 a state prisoner need not petition the Pennsylvania Supreme Court for allocatur in order to exhaust state court remedies and seek habeas relief in federal court. See Wilson v. Vaughn, 304 F. Supp. 2d 652 (E.D. Pa. 2004); Lor v. Varner, 2003 WL 22845413 (E.D. Pa. Nov. 26, 2003); Lambert v. Blackwell, 2003 WL 1718511

(E.D. Pa. April 1, 2003); Leon v. Benning, 2003 WL 21294901 (E.D. Pa. Feb. 24, 2003); Mattis v. Vaughn, 128 F. Supp. 2d 249 (E.D. Pa. 2001); Blasi v. Attorney General, 120 F. Supp. 2d 249 (M.D. Pa. 2000). Other Circuits have reached similar conclusions with regard to comparable state supreme court rules. See Adams v. Holland, 330 F.3d 398, 401-02 (6th Cir. 2003) (Tennessee); Randolph v. Kemna, 276 F.3d 401, 404 (8th Cir. 2002) (Missouri); Swoopes v. Sublett, 196 F.3d 1008, 1009-10 (9th Cir. 1999) (per curiam) (Arizona). We reserved judgment on this issue in Wenger v. Frank, 266 F.3d 218, 217-218 (3d Cir. 2001) and Villot v. Varner, 373 F.3d 327, 338 n.14 (3d Cir. 2004). We now hold that Order No. 218 renders review from the Pennsylvania Supreme Court "unavailable" for purposes of exhausting state court remedies under § 2254(c).

Order No. 218 serves to remove review of criminal and collateral appeals from the "normal" and "established" appellate review procedure in Pennsylvania. As Judge Van Antwerpen put it in Mattis v. Vaughn, Order No. 218 is the something "more" that makes the Pennsylvania Supreme Court's discretionary review system "unavailable." 128 F. Supp. 2d at 259. Consequently, petitioners need not seek review from the Pennsylvania Supreme Court in order to give the Pennsylvania courts a "full opportunity to resolve any constitutional claims."

Here, the Superior Court affirmed the PCRA Court's judgment on December 18, 2000. During the pendency of Lambert's appeal in the Superior Court, the Pennsylvania Supreme Court issued Order No. 218. Consequently, she did not seek an allowance of an appeal from the Pennsylvania Supreme Court within the necessary thirty-day time period. Instead, she filed a federal habeas petition on January 29, 2001. We conclude that, due to Order No 218, Lambert exhausted her available state court remedies.

B.   Deference

AEDPA requires federal courts collaterally reviewing state proceedings to afford considerable deference to state courts' legal and factual determinations. Specifically, it provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an

23

unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). In addition, "a determination of a factual issue made by a State court shall be presumed to be correct" unless the petitioner rebuts "the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

The Supreme Court interpreted § 2254(d)(1)'s deference to state legal determinations in Williams v. Taylor, 529 U.S. 362 (2000). The Court interpreted AEDPA's "clearly established Federal law, as determined by the Supreme Court of the United States" to mean "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Id. at 412. A state-court decision is "contrary to" clearly established federal law if the state court (1) "contradicts the governing law set forth in [the Supreme] Court's cases'" or (2) "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a [different] result." Id. at 405-06. A state-court decision "involve[s] an unreasonable application" of clearly established federal law if the state court (1) "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case"; or (2) "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or

unreasonably refuses to extend that principle to a new context where it should apply." Id. at 407.

The Supreme Court addressed AEDPA's factual review provisions in Miller-El v. Cockrell. There, the Supreme Court interpreted § 2254(d)(2) to mean that "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." 537 U.S. 322, 340 (2003). Yet "deference does not imply abandonment or abdication of judicial review." Id. In other words, "[d]eference does not by definition preclude relief." Id. Thus a federal habeas court can "disagree with a state court's credibility determination." Id.; see also Wiggins v. Smith, 539 U.S. 519, 123 S. Ct. 2527, 2539 (2003) (rejecting state court's factual determination under § 2254(e)(1) and 2254(d)(2)).

Despite the Supreme Court's pronouncements in Miller-El and Wiggins, a comprehensive interpretation of AEDPA's factual review scheme has yet to emerge from the federal courts. Specifically, the relationship between the standards enunciated in § 2254(d)(2) and § 2254(e)(1) remains unclear. See Green v. White, 232 F.3d 671, 672 n.3 (9th Cir. 2000).

On their face, we discern little material difference between a reasonableness determination and a presumption of correctness as they express

the same fundamental principle of deference to state court findings. Courts have tended to lump the two provisions together as generally indicative of the deference AEDPA requires of state court factual determinations. See, e.g., Martini v. Hendricks, 348 F.3d 360, 363 (3d Cir. 2003); Hunterson v. DiSabato, 308 F.3d 236, 245-46, 249-50 (3d Cir. 2002). Yet it is a cardinal rule of statutory interpretation that we must "give effect, if possible, to every clause and word of a statute." Williams v. Taylor, 529 U.S. at 404 (internal citations and quotations omitted); see also Kungys v. United States, 485 U.S. 759, 778 (1988) (Scalia, J., plurality opinion); Borman v. Raymark Indus., Inc., 946 F.2d 1031, 1035 (3d Cir. 1991) ("It is an 'elementary canon of construction that a statute should be interpreted so as not to render one part inoperative.'") (quoting Colautti v. Franklin, 439 U.S. 379, 392 (1979)). In fact, the language of § 2254(d)(2) and § 2254(e)(1) implies an important distinction: § 2254(d)(2)'s reasonableness determination turns on a consideration of the totality of the "evidence presented in the state-court proceeding," while § 2254(e)(1) contemplates a challenge to the state court's individual factual determinations, including a challenge based wholly or in part on evidence outside the state trial record. See generally Taylor v. Maddox, 366 F.3d 992, 999-1000 (9th Cir. 2004); Valdez v. Cockrell, 274 F.3d 941, 951 n.17 (5th Cir. 2001).

We therefore read § 2254(d)(2) and § 2254(e)(1) together as addressing two somewhat different inquiries. The fundamental prerequisite to granting the writ on factual grounds is consideration of the evidence relied upon in the state court proceeding. Section 2254(d)(2) mandates the federal habeas court to assess whether the state court's determination was reasonable or unreasonable given that evidence. If the state court's decision based on such a determination is unreasonable in light of the evidence presented in the state court proceeding, habeas relief is warranted.

Within this overarching standard, of course, a petitioner may attack specific factual determinations that were made by the state court, and that are subsidiary to the ultimate decision. Here, section 2254(e)(1) comes into play, instructing that the state court's determination must be afforded a presumption of correctness that the petitioner can rebut only by clear and convincing evidence. In this inquiry, a petitioner may develop clear and convincing evidence by way of a hearing in federal court as long as he satisfies the necessary prerequisites. See 28 U.S.C. § 2254(e)(2). In the final analysis however, even if a state court's individual factual determinations are overturned, what factual findings remain to support the state court decision must still be weighed under the overarching standard of section 2254(d)(2).[19]

---

[19] The two circuits that have considered the interplay between section 2254(d)(2) and (e)(1) have intimated two slightly different approaches to resolving

questions under the respective provisions. In <u>Valdez v. Cockrell</u>, the Fifth Circuit suggested that individual factual challenges should be evaluated under (e)(1) first, and then, after they are resolved, the habeas court should consider the entirety of the record under (d)(2). 274 F.3d at 951 n.17. Somewhat more explicitly, the Ninth Circuit has said that the habeas court should evaluate the totality of the record first under (d)(2), and, if it survives, cloak the state court's decision with a presumption of correctness to "steel" it against challenges based on new evidence, extrinsic to the state court record.

We adopt no rigid approach to habeas review of state fact-finding. In some circumstances, a federal court may wish to consider subsidiary challenges to individual fact-finding in the first instance applying the presumption of correctness as instructed by (e)(1). Then, after deciding these challenges, the court will view the record under (d)(2) in light of its subsidiary decisions on the individual challenges. In other instances, a federal court could conclude that even if petitioner prevailed on all of his individual factual challenges notwithstanding the (e)(1) presumption of their correctness, the remaining record might still uphold the state court's decision under the overarching standard of (d)(2). In that event, presumably the (d)(2) inquiry would come first.

Whatever the order of inquiry,

With these principles in mind, we turn to the specifics of this case. Lambert argues that we should not afford the PCRA Court and Superior Court factual determinations the deference set forth in § 2254(d) and § 2254(e)(1), for two reasons. First, she argues that the PCRA Court and Superior Court decisions are null and void—and therefore not entitled to deference—because those courts lacked jurisdiction to entertain her untimely PCRA petition.[20] See <u>Commonwealth v.</u>

however, two points are paramount. First, both (d)(2) and (e)(1) express the same fundamental principle of deference to state court findings. Second, before the writ can be granted, petitioner must show an unreasonable determination -- under (d)(2) -- in light of the entire record in the original state court trial.

[20] Lambert also argues that the law of the case doctrine required Judge Brody to adhere to Judge Dalzell's decision that the state court proceedings were null and void. "The law of the case doctrine limits the extent to which an issue will be reconsidered once the court has made a ruling on it." <u>Fagan v. City of Vineland</u>, 22 F.3d 1283, 1290 (3d Cir. 1994). "A court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance, although as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.'"

<u>Fahy</u>, 737 A.2d 214 (1999). Second, Lambert argues that the PCRA Court's factual determinations are not entitled to deference because the Court prohibited her from cross-examining witnesses at the PCRA hearing.[21]

---

<u>Christianson v. Colt Industries Operating Corp.</u>, 486 U.S. 800, 817 (1988) (quoting <u>Arizona v. California</u>, 460 U.S. 605, 618 n. 8 (1983)). In other words, the law of the case doctrine does not limit a federal court's power, rather it directs its exercise of discretion. <u>Public Interest Research Group of New Jersey, Inc. v. Magnesium Elektron, Inc.</u>, 123 F.3d 111, 116 (3d Cir. 1997).

Lambert's argument that the District Court abused its discretion need not detain us long. "[A] district court's adherence to law of the case cannot insulate an issue from appellate review." <u>Christianson</u>, 486 U.S. at 817. Conversely, a district court's decision not to adhere to a coordinate court's previous decision cannot prevent us from deciding the issue on the merits. Whether the District Court followed the first habeas court's ruling or came to its own contrary conclusion (as it did), we would still have to determine what the correct decision is. <u>See</u> <u>Tischmann v. ITT/Sheraton Corp.</u>, 145 F.3d 561, 564-65 (2d Cir. 1998). The law of the case doctrine is irrelevant to our decision. What matter are the merits.

[21] Lambert does not argue that we should not afford deference to Judge Stengel's findings made at the trial level.

On its face, AEDPA does not provide that a federal habeas court should, before affording deference to state court determinations, evaluate the procedural adequacy of state court proceedings or whether the state court/ properly exercised its jurisdiction. This omission is particularly conspicuous in light of the pre-AEDPA federal habeas statute.

Before AEDPA amended the federal habeas statute in 1996, state court findings of fact were "presumed correct if there was (1) a hearing on the merits of a factual issue, (2) made by a state court of competent jurisdiction, (3) in a proceeding to which the petitioner and the state were parties, (4) and the state court's determination is evidenced by a written finding, opinion, or other reliable and adequate indicia." <u>Carpenter v. Vaughn</u>, 296 F.3d 138, 149 (3d Cir. 2002). This presumption did not apply if the petitioner established, <u>inter alia</u>, that (i) "the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing," 28 U.S.C. § 2254(d)(2) (1994) (superseded); or (ii) "the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding," 28 U.S.C. § 2254(d)(4) (1994) (superseded).[22]

---

Her jurisdiction and cross-examination arguments, of course, do not apply to those findings.

[22] The pre-AEDPA statute provided, in relevant part:

(d) In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit—

(1) that the merits of the factual dispute were not resolved in the State court hearing;

(2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;

(3) that the material facts were not adequately developed at the State court hearing;

(4) that the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding;

(5) that the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding;

(6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or

(7) that the applicant was otherwise denied due process of law in the State court proceeding;

(8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the

The current statute simply states that federal courts must defer to legal and factual determinations "with respect to any claim that was adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d). "We have interpreted § 2254(d)'s 'adjudication on the merits' language to mean that 'when, although properly

---

record.

And in an evidentiary hearing in the proceeding in the Federal court, when due proof of such factual determination has been made, unless the existence of one or more of the circumstances respectively set forth in paragraphs numbered (1) to (7), inclusive, is shown by the applicant, otherwise appears, or is admitted by the respondent, or unless the court concludes pursuant to the provisions of paragraph numbered (8) that the record in the State court proceeding, considered as a whole, does not fairly support such factual determination, the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous.

28 U.S.C. § 2254(d) (1994) (superseded).

preserved by the defendant, the state court has not reached the merits of a claim thereafter presented to a federal habeas court, the deferential standards provided by AEDPA . . . do not apply." Holloway v. Horn, 355 F.3d 707, 718 (3d Cir. 2004) (quoting Appel v. Horn, 250 F.3d 203, 210 (3d Cir. 2001)).

AEDPA has changed the procedural framework for deference in three ways. First, AEDPA now requires federal courts to defer to state court *legal* determinations, whereas federal courts used to review state legal determinations de novo. See, e.g., Ahmad v. Redman, 782 F.2d 409, 412 (3d Cir. 1986). Second, the habeas statute no longer explicitly conditions federal deference to state court factual findings on whether the state court held a hearing. See Mendiola v. Schomig, 224 F.3d 589, 592-93 (7th Cir. 2000). Third, the statute no longer contains the eight prerequisites to deference that appeared in the superseded §§ 2254(d)(1)-(8). See Valdez v. Cockrell, 274 F.3d at 951 (holding that a "full and fair hearing" is not a precondition to according 2254(e)(1)'s presumption of correctness to a state habeas court's findings of fact); but see Valdez v. Cockrell, 274 F.3d at 966 (Dennis, J., dissenting); 17A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 4265.2 (2d ed. 1994) ("Indeed the new statute does not even require that the state court that made the determination have been a court of competent jurisdiction. Presumably the courts will continue to insist on that and it is likely that some of the other elements

that were in the old statute but not in the new one will be read back into it by the courts.").

On its face, therefore, the amended habeas statute appears to obviate any need to consider Lambert's jurisdictional and procedural arguments against our deferring to the PCRA Court's determinations; AEDPA eliminated the threshold language eliminating the presumption of correctness when "the State court lacked jurisdiction" or "the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing." We decline to conclude, however, that state court jurisdiction or procedures are entirely irrelevant in a federal court's habeas review of state court determinations.

Even under AEDPA, federal courts are to defer regarding claims "adjudicated on the merits in State court proceedings." This implies that the claim must be adjudicated by a court of competent jurisdiction, as opposed to a kangaroo court or an administrative body masquerading as a court. At the same time, however, AEDPA's amendments to the habeas statute surely lower the level of scrutiny a federal court is entitled to apply to the issue of state court jurisdiction. For purposes of applying deference under section 2254(d) and (e), when a valid state court judgment exists a federal habeas court should generally presume that the state court properly exercised its jurisdiction.[23]

Similarly, the procedures a state court applies when adjudicating a petitioner's claims may also be relevant during habeas review. The extent to which a state court afforded a defendant adequate procedural means to develop a factual record—whether the defendant was afforded a "full and fair hearing," to put it in the parlance of the pre-AEDPA statute—may well affect whether a state court's factual determination was "reasonable" in "light of the evidence presented in the State court proceeding" or whether the petitioner has adequately rebutted a presumption that the state court's determination is correct. See Taylor v. Maddox, 366 F.3d 992, 1000-01 (9th Cir. 2004); cf. Valdez v. Cockrell, 274

---

[23] This is somewhat different than the level of scrutiny we apply to state jurisdictional questions in the context of determining whether there is an adequate and independent procedural bar to federal habeas relief. See, e.g. Hull v. Kyler, 190 F.3d 88, 100-03 (3d Cir. 1999). The Supreme Court has specifically delineated the role of a federal habeas court in assessing whether a state court decision rests on an independent procedural bar. See Coleman v. Thompson, 501 U.S. 722 (1991). In the instant case, however, we deal with the jurisdictional issue in the different context of deferring to state court fact-finding -- an area in which Congress spoke in AEDPA by facially eliminating the requirement of a jurisdictional inquiry.

F.3d at 951 n.17; Mendiola, 224 F.3d at 592 ("If a state court's finding rests on thin air, the petitioner will have little difficulty satisfying the standards for relief under § 2254"); Weaver v. Thompson, 197 F.3d 359, 363 (9ᵗʰ Cir. 1999) (statements in the trial judge's letter were not "factual determinations" because they were not "subject to any of the usual judicial procedures designed to ensure accuracy"). In other words, the extent to which a state court provides a "full and fair hearing" is no longer a threshold requirement before deference applies; but it might be a consideration while applying deference under § 2254(d)(2) and § 2254(e)(1).

We need not comprehensively or exhaustively address how deeply a federal habeas court may plumb the adequacy of state court jurisdiction and procedures in deciding how to apply section 2254(d) and (e)(2). We conclude in the particular circumstances of this case that no jurisdictional concerns obviate the application of AEDPA's deferential scheme of review. Nor do any procedural issues lower the level of deference we must afford.

First, the Pennsylvania courts affirmatively exercised jurisdiction over Lambert's PCRA petition. Judge Dalzell concluded that the PCRA Court and Superior Court lacked jurisdiction under Pennsylvania law and that, under Pennsylvania law, "'[w]here a court lacks jurisdiction in a case, any judgment regarding the case is void.'" Lambert v. Blackwell, 175 F. Supp. 2d at 787 (quoting

Rieser v. Glukowsky, 690 A.2d 742 (Pa. Super. 1997)). But after AEDPA eliminated jurisdictionally-based challenges to state court decisions, a federal habeas court has at most a circumscribed role in reviewing whether a state court properly applied its own law when it explicitly decided to exercise jurisdiction.[24]

---

[24] "The United States Supreme Court has repeatedly declared that, in a federal habeas proceeding such as this, 'state courts are the ultimate expositors of state law . . . and we are bound by their constructions except in rare circumstances.'" Humanik v. Beyer, 871 F.2d 432, 436 (3d Cir. 1989) (quoting Mullaney v. Wilber, 421 U.S. 684, 691 (1975)). We reiterated this point in Johnson v. Rosemeyer, where we summarized our precedent as counseling that "a federal court in a habeas case must be most circumspect in re-examining state court decisions," and "only in extraordinary circumstances should a federal district court in a habeas corpus case decline to follow the opinions of a state intermediate court of appeal with respect to state law rendered in earlier proceedings involving the petitioner." 117 F.3d 104, 114-15 (3d Cir. 1997); see also Poe v. Caspari, 39 F.3d 204, 207 (8ᵗʰ Cir. 1994) ("Jurisdiction is no exception to the general rule that federal courts will not engage in collateral review of state court decisions based on state law."). Of course, in Humanik, Barry, Rosemeyer, and Poe, the state court determinations of state law

To be sure, the Superior Court's decision appears to be internally contradictory. The Court determined that Lambert's PCRA petition was untimely and the PCRA Court had "no jurisdiction to address the substantive merits of the petition." Commonwealth v. Lambert, 765 A.2d at 319. Yet the Court decided to entertain Lambert's appeal and review the PCRA Court's judgment. Id. at 322-23. That decision was motivated in part by a recognition that the Pennsylvania Supreme Court decision in Commonwealth v. Fahy, supra, that established a jurisdictional bar to untimely PCRA filings did not issue until after Lambert had filed her PCRA application. In other words, the Superior Court effectively determined to carve out an exception to Fahy's retroactive application, at least in the somewhat unusual circumstances of Lambert's case. 765 A.2d at 322-23. A federal court will normally defer to a state court's decision about retroactivity of state decisions. See Fiore v. White, 531 U.S. 225 (2001).

In short, the Superior Court decided to retain and exercise jurisdiction. The Superior Court's opinion concluded by stating: "Based upon the foregoing, we hold that Appellant has not met her burden under the PCRA statute. Accordingly, we affirm the PCRA court's order denying

went to the merits of the petitioners' habeas claims. Here, the Superior Court's determination of state law regards whether as a jurisdictional matter state courts could entertain Lambert's claims on collateral review. See note 23, supra.

Appellant the collateral relief she requested. Order affirmed." Id. at 363. Whatever our residual ability to examine state court jurisdiction in other instances, the exercise of jurisdiction by the state court in this instance does not call into question that adequacy of the state court proceeding under section 2254(d) and (e).[25]

We turn to Lambert's second argument. Several prosecutorial and law enforcement witnesses, who Lambert alleges engaged in extensive misconduct, testified at the PCRA hearing. Lambert argues that the PCRA Court refused to "allow Lambert to cross-examine the perpetrators of the prosecutorial misconduct." Lambert Br. 34. She

[25] Our decision in In re James, 940 F.2d 46 (3d Cir. 1991), which Lambert cites in her brief, does not persuade us otherwise. There, we held that a federal court may vacate a state court decision when the state court acts in violation of the federal bankruptcy statute's automatic stay provisions. See Raymark Indus., Inc. v. Lai, 973 F.2d 1225, 1132 (3d Cir. 1992) (construing In re James). We reached that conclusion because an automatic stay obviates the state court's jurisdiction and renders its decision void *ab initio*. In re James differs from this case (and most cases) because the state court's jurisdiction, or lack thereof, was a function of federal law (the federal bankruptcy statute). Here, in contrast, the PCRA Court's jurisdiction is a matter of state law.

32

contends that the PCRA Court's credibility determination are not worthy of deference because "credibility determinations of witnesses who are never subjected to the crucible of cross-examination are not entitled to deference." Id. She cites cases standing for the proposition that cross-examination provides "the principal means by which the believability of a witness and the truth of his testimony are tested." Davis v. Alaska, 415 U.S. 308, 316 (1974).

We find Lambert's argument, as she frames it, extremely misleading. Cross-examination is "[t]he questioning of a witness at a trial or hearing *by the party opposed to the party who called the witness to testify*." Black's Law Dictionary 383 (7th ed. 1999). (emphasis added). The PCRA Court did not preclude Lambert from cross-examining any witnesses. Rather, the Court applied Pennsylvania law on evidence and, except for one instance, did not allow Lambert to ask leading questions to the witnesses she called on *direct examination*. PCRA Court Decision 47-59. Lambert does not complain that she was not allowed to cross-examine Commonwealth witnesses.

More importantly, however, the fact-finding process was not inexorably undermined by the PCRA Court's evidentiary determination. We have extensively reviewed the record of the PCRA hearing. The PCRA Court's decision not to allow Lambert to ask leading questions of witnesses she called on direct examination in no way impugns

the Court's factual determinations.[26] That

---

[26] We concur in the following observations of the Pennsylvania Superior Court:

> [T]he PCRA court permitted counsel to defend Appellant's rights with zeal, bringing to the attention of the court all of the errors that, according to Appellant, caused her an unfair trial. The PCRA court allowed her to reiterate her claims and explore every avenue for relief. The PCRA court demonstrated remarkable patience and thoroughness throughout the proceedings, which provided for review on appeal over eight thousand pages of testimony from trial and the PCRA hearing, along with other filings, as well as the PCRA court's three hundred and twenty (320) page main opinion.

765 A.2d at 323. We also note that the PCRA Court allowed Lambert to impeach witnesses using testimony developed at the 1997 federal habeas hearing, where Judge Dalzell apparently let her attorneys ask leading questions. See, e.g., App. 3793. This further undermines any suggestion that we should not defer to the PCRA Court's factual determinations due to Lambert's inability to "cross-examine"

33

is not to say that in certain instances a court's prohibition on asking leading questions could not undermine to some extent a state court's factual determinations. This is simply not such a case.

## C.    The Merits

We discern in Lambert's brief twelve claims supporting her petition for a writ of habeas corpus. Those are the claims for which we grant a COA.[27] We

---

witnesses.

[27] Lambert does not pursue on appeal many of the numerous claims she pursued at one point or another during the lengthy state and federal proceedings. Lambert alleged before Judge Dalzell and the PCRA Court, for example, that Corporal Solt fabricated a portion of the written statement that the Commonwealth claimed at trial represented what she told the police when they arrested her the day of Show's murder. As we explained above, Solt testified that a fellow officer transcribed Lambert's statement and she later signed it. A portion at the end of the statement is handwritten, however, while most of the statement was typed. In the handwritten portion, Lambert explained the route she took to flee the Show apartment. She also said that she was wearing black sweat pants and a red flannel shirt (i.e. Yunkin's clothing). Appellate App. 1581-82. Lambert claimed before Judge Dalzell and the PCRA Court that the police fabricated the handwritten portion. See Lambert v. Blackwell, 962 F.

address them in turn.

As a preliminary matter, we note that Lambert relies on the same record in her federal habeas proceedings as she did in the state PCRA proceedings. She has made no attempt to augment the record. We therefore simply apply § 2254(d)(2)'s reasonableness standard to the PCRA Court's factual determinations. With respect to the trial court's factual determinations, however, we apply a two-tiered analysis because Lambert seeks to rebut the trial court's findings through

---

Supp. at 1542. Yet at trial Lambert specifically acknowledged telling Solt what the handwritten portion of the statement indicates—namely that she was wearing Yunkin's clothes—but she claimed she had lied to the police. When asked why she lied, Lambert explained that she "thought if they found the clothes they would know they were Lawrence's clothes and he would get in trouble so I said I had them on." App. 1218.

On its face, then, Lambert's accusation of misconduct against Solt in federal court is utterly belied by her own testimony at trial. We assume that Lambert does not pursue this claim, and others, because she has taken the prudent course of only pursuing the arguments she perceives as her strongest. Regardless, we only grant a COA on those issues Lambert has briefed and pursued on appeal. We observe that many of the claims raised in District Court were as ill-founded as the fabrication claim we discuss here.

evidence that was not before that court, namely evidence developed at the PCRA proceedings. Thus, when reviewing trial court factual determinations, we first determine whether they were reasonable in light of the record before the trial court. If reasonable, we then look to whether Lambert has rebutted the finding with clear and convincing evidence adduced at the PCRA hearing.

### 1. The Sweatpants

As we explained above, Yunkin testified that Lambert wore his sweatpants—which the police eventually obtained and which contained Show's blood on them—the morning of Show's murder. Lambert argues that the Commonwealth—specifically the prosecutor, John Kenneff—knew that Lambert did not wear Yunkin's sweatpants that morning and nonetheless elicited testimony from Yunkin to the contrary. She also argues that the Commonwealth "switched" the sweatpants at the PCRA Hearing. That is, she argues that the Commonwealth replaced the sweatpants from the trial with a different pair, which it offered into evidence at the PCRA Hearing and told the PCRA Court were the same sweatpants as those from the trial.

### a. Knowing Use of Perjured Testimony

The Supreme Court has long held that the state's knowing use of perjured testimony to obtain a conviction violates the Fourteenth Amendment. See Giglio v. United States, 405 U.S. 150, 153 (1972);

Napue v. Illinois, 360 U.S. 264, 269 (1959); Pyle v. Kansas, 317 U.S. 213, 216 (1942); Mooney v. Holohan, 294 U.S. 103, 112 (1935). In United States v. Agurs, the Supreme Court characterized this line of cases as finding it fundamentally unfair to the accused where "the prosecution's case includes perjured testimony and [] the prosecution knew, or should have known, of the perjury." 427 U.S. 97, 103 (1976). "The same is true when the government, although not soliciting false evidence, allows it to go uncorrected when it appears at trial." United States v. Biberfeld, 957 F.2d 98, 102 (3d Cir. 1992) (citing Giglio, 405 U.S. at 153).

In such circumstances, the conviction must be set aside "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." Id. In United States v. Bagley, the Court explained: "Although this rule is stated in terms that treat the knowing use of perjured testimony as error subject to harmless error review, it may as easily be stated as a materiality standard under which the fact that testimony is perjured is considered material unless failure to disclose it would be harmless beyond a reasonable doubt." 473 U.S. 667, 679-80 (1985).

Thus, in order to make out a constitutional violation Lambert must show that (1) Yunkin committed perjury; (2) the government knew or should have known of his perjury; (3) the testimony went uncorrected; and (4) there is any reasonable likelihood that the false

testimony could have affected the verdict. The state trial court and PCRA Court concluded that Lambert had in fact worn Yunkin's sweatpants and Yunkin therefore did not perjure himself. These factual determinations preclude a finding of constitutional error, and we review them under the applicable AEDPA standard.

At trial Lambert's counsel, Roy Shirk, strongly urged Judge Stengel to conclude that Lambert did not wear Yunkin's clothes on the day of Show's murder, and he developed testimony to support this argument. He elicited testimony from Yunkin's friend, Vincent Orsi, that Yunkin would wear the sweatpants "to bed, bumming around the house." App. 950. Lambert testified that although she told the police that she wore a red flannel shirt and black sweatpants the morning of Show's murder, she had lied to them in order to protect Yunkin. To contradict the reason Yunkin gave for why Lambert wore his clothing—i.e., she was well into her pregnancy—Shirk elicited testimony that Lambert was barely "showing" at that stage of her pregnancy. And he had the following exchange with Yunkin on cross-examination:

> Q. So basically what you are telling us here this morning, Michelle was wearing all your clothing?
>
> A. Correct.
>
> Q. The sweat pants were yours.

A. Correct.

Q. The red flannel was yours.

A. Correct.

Q. The jergo was yours.

A. Correct.

Q. I'm going to show you what's been marked Commonwealth Exhibit 10. That's your jacket?

A. Yes, it is. Extra large.

Q. Extra large?

A. Correct.

Q. I'm going to show you what's been marked Commonwealth Exhibit 9. They are your sweat pants?

A. Yes.

Q. In fact you used to wear them to bed and you used to wear them while you were lounging around. You used to wear these quite a bit, didn't you?

A. Yes.

Q. Now you indicated that Michelle was pregnant at the time, is that correct?

A. Yes.

Q. You indicated she was seven months pregnant.

A. Around there, yes.

36

Q. Around six months?

A. Between six and seven.

Q. She wasn't really heavy at the time, was she? She wasn't showing a lot.

A. Not really, no.

Q. But it's your testimony that she left the house that day basically clothed in your clothing.

A. True.

App. 273-74.

During his closing argument, Shirk argued that all the evidence suggested that Lambert did not wear Yunkin's clothing. The relevant portion of his closing went as follows:

> The assumption we're supposed to make is that my client, due to her pregnancy, wore Mr. Yunkin's clothes, perhaps to be more comfortable because she was pregnant and obviously bigger than she normally is; although Chief Glick, in his testimony, indicated she really wasn't showing that much. I find it, or the defense finds it, incredible.
>
> Would you hold up that jacket.
>
> Mr. Jeffries: (Complying with the request.)

Mr. Shirk: That is for a fray in the morning that was going to last, whatever, an hour or two, three, she would wear this for comfort; and the clothing she put on to wear the rest of the day, or at least the clothing that Detective—Trooper Solt indicated he believed she had on that evening, the difference in size. She was going to spend a lot more time in this—(holding up a sweater)—and she had to wear that for comfort a few hours in the morning.

(Holding up a pair of pants.)

This is what she wore the rest of the day, compared to them.

You may sit down. Thank you.

(Mr. Jeffries returned to the defense table.)

Mr. Shirk: You Honor, I think even the clothing is consistent with the defendant's testimony.

Vinnie Orsi suggested that Mr. Yunkin wore them to bed any time he was over there, wore them around leisurely. Mr. Yunkin admitted from the stand he wore those sweat pants to bed. Lisa Lambert, in her

37

testimony, said, interestingly enough, just off the cuff: He got up that morning, had his sweat pants on, threw something on and away they went.

Probably very likely what happened, he was getting up early that morning, just kept on his sweat pants, threw on his red flannel, his jergo, and away they went. It would seem incredible that they got up that time in the morning and he wears these to bed all the time, he took them off to give them to her to put on. Difficult to believe. I think the clothing is consistent with her statement.

App. 1289-90.

After Judge Stengel found Lambert guilty, she again advanced her argument regarding Yunkin's sweatpants in her post-verdict motion seeking an arrest of judgment and a new trial. Addressing the argument that the evidence regarding the sweatpants rendered the verdict against the weight of the evidence, Judge Stengel wrote: "[F]or defendant to argue that the killer was wearing Mr. Yunkin's clothing and, therefore, must have been Mr. Yunkin is ludicrous. . . . The court listened to the testimony regarding the clothing, observed the size of the garments and the size of the people involved, i.e., Ms. Lambert, Ms. Buck and Mr. Yunkin, and found there to be no question raised by the fact that the clothing appeared to be Mr. Yunkin's." App. 1633. As Judge Stengel later put it: "The only real question was whether [Lambert] could have worn sweatpants owned by the larger Yunkin. This was resolved by the court's observations of the sweatpants, of Mr. Yunkin, of Ms. Lambert, and the conclusion that Ms. Lambert could certainly have worn the garment." PCRA Decision 204.

Lambert urges us to conclude that the trial court's finding of fact was unreasonable given the record before it and that the only reasonable conclusion was that Yunkin wore the sweatpants the day of the murder. Her argument is this: Since Yunkin was 6'1" tall and weighed 190 pounds and he admittedly wore the sweatpants at times, it was impossible for Lambert (who was 5'6" tall and weighed 143 pounds at the time) to have worn them.

In order to accept Lambert's argument, however, we must make several speculative leaps that find no support in the record. First, we must infer that it was physically impossible for Lambert to fit into a pair of sweatpants that would have fit the larger Yunkin. Alternatively, we must assume that people always wear clothes that fit them perfectly—that is, people never wear clothes that are large on them—and that it is therefore unreasonable to conclude that either Lambert or Yunkin wore sweatpants that did not properly fit them. But neither of these suggestions is supported by the record or common sense.

38

The PCRA Court considered Lambert's argument and reached the same conclusion. "Petitioner suggests that the sweatpants in 1992 were so large," the Court explained, "that Ms. Lambert would be 'swimming in them.'" But, the Court concluded, "[t]here is simply no testimony or even any argument to this effect." PCRA Decision 209-10.

We agree with this conclusion. Against the weight of Lambert's speculative argument is a conclusion by a finder of fact who had the opportunity of observing both Lambert and the sweatpants during the trial itself. Lambert's counsel was free to argue that Yunkin's clothes were too big for Lambert to wear, but the judge was free to disregard those arguments and to base his findings on his own observation.

Thus Lambert's claim that the prosecution must have knowingly relied on perjured testimony because the sweatpants did not fit collapses. Lambert's vehement disagreement with the prosecutor's theory — and with the judge's finding — does not amount to a good faith basis to allege perjury. There is simply no foundation in the record for this allegation.

b. "Switching" Evidence

Lambert argues that she is nonetheless entitled to relief due to the Commonwealth's misconduct at the PCRA hearing. Specifically, Lambert argues that at the PCRA hearing, the Commonwealth offered into evidence sweatpants that were different than those offered into evidence at trial. In other words, she argues that "the

Commonwealth switched evidence and produced different sweatpants than those used at trial." Lambert Br. 41. The PCRA Court rejected Lambert's argument, because it found that there was no "proof that the sweatpants admitted into evidence as Commonwealth's Exhibit 9 in 1992 have ever been altered, changed, or substituted." PCRA Decision 209.

To support her "switching" claim before the PCRA Court, Lambert offered testimony that the sweatpants at the trial tested positive for blood, while the sweatpants at the PCRA hearing did not. In addition, a textile expert opined that the sweatpants at the PCRA hearing were sized "boy's extra large" and that a 6'1" individual who weighed one hundred and ninety pounds—Yunkin's approximate height and weight at the time of the murder—could not fit into them. Lambert's trial counsel, Roy Shirk, also testified at the PCRA hearing that, to the best of his recollection, the sweatpants at the PCRA hearing were smaller than those at trial. He also opined that the sweatpants at the PCRA hearing would not fit Yunkin.

On the other hand, the Commonwealth offered evidence that the officer who logged the contents of the bag found in the dumpster behind K-Mart listed the sweatpants that were eventually admitted into evidence at the trial as "ladies dress 'black' sweatpants (appears small size)." App. 7015. This would tend to contradict Lambert's bald assertion that the sweatpants at trial were so huge that she could not wear them. The forensic scientist who performed the test to check

39

for blood prior to the trial, Donald P. Bloser, Jr., testified that the markings he made on the sweatpants from trial still appeared (albeit faded) on the sweatpants at the PCRA hearing. Bloser also testified that the sweatpants tested "very weak" for blood prior to trial in 1992 and that he found no presence of blood when he retested other evidence (such as the ski hats) that had also tested "very weak" for blood in 1992. App. 2759.[28] In addition, an investigator from the Commonwealth, James Gallagher, testified about a photograph he took using the sweatpants in evidence at the PCRA hearing. He took a photograph in which he laid the sweatpants against cardboard box lids that had also appeared in a photograph of the sweatpants from trial. The Court concluded that the two photographs looked substantially similar.

Given the record before it, the PCRA court's factual determination that the sweatpants were not "switched" is reasonable. There is substantial evidence in the record to support the conclusion, and the evidence to the contrary is considerably weaker.

More important, Lambert's "switching" claim provides no basis for habeas relief. She argues that "the Commonwealth's attempt to uphold

Lambert's conviction on evidence contradictory to that used to convict her violates 'the most basic notions of due process.'" Lambert Br. 41. In support of this proposition, she cites Dunn v. United States, 442 U.S. 100 (1979), Smith v. Groose, 205 F.3d 1045 (8th Cir. 2000), and Thompson v. Calderon, 120 F.2d 1045 (9th Cir. 1997).

In Dunn, the Court of Appeals had affirmed a conviction based on facts that had been adduced at trial but that neither supported the offense charged in the indictment nor provided the foundation for the jury's conviction. The Supreme Court held that "appellate courts are not free to revise the basis on which a defendant is convicted simply because the same result would likely obtain at trial." 442 U.S. at 107. In other words, a defendant's due process rights are violated when his conviction is affirmed on an offense that he was not charged with and that was not presented to the jury or court that tried him.

Smith and Thompson involved instances where the government offered contradictory theories in two separate trials to convict two individuals for the same crime. The Thompson court held that "when no new significant evidence comes to light a prosecutor cannot, in order to convict two defendants at separate trials, offer inconsistent theories and facts regarding the same crime." 120 F.3d at 1058. The Smith court concluded that the "State's use of factually contradictory theories constituted 'foul blows'" and "deprived [the defendant] of due process

---

[28] Bloser also testified that evidence that tested "positive" for blood in 1992 tested "very weak" for blood when he tested it prior to the PCRA hearing. App. 2759.

and rendered his trial fundamentally unfair." 205 F.3d at 1051.

To a certain degree <u>Dunn</u> and <u>Smith</u>/<u>Thompson</u> represent different sides of the same coin. Dunn requires a certain degree of vertical consistency (between trial and appeal) in the theories the government offers, while <u>Smith</u> and <u>Thompson</u> require a certain degree of horizontal consistency (between two trials). Both lines of cases are inapposite, however, because they do not provide a basis for habeas relief here.

Lambert's argument suffers from the same "fundamental flaw" that we identified in the petitioner's argument in <u>Gattis v. Snyder</u>, 278 F.3d 222 (3d Cir. 2002). There, we explained:

> The fundamental flaw in Gattis' argument is that in the decisions of which he complains the state courts did not "uphold [his] conviction on a charge that was neither alleged in an indictment nor presented to a jury at trial." [<u>Dunn</u>, 442 U.S. at 106]. The allegedly different theory of guilt was not presented on direct appeal in support of his conviction but in the course of a post-conviction hearing held in connection with his claim that counsel was ineffective for failing to present expert testimony concerning the

implausibility of the state's account of the murder. The Superior Court and Delaware Supreme Court did not affirm his conviction based on the state's theory but merely found his ineffectiveness claim unpersuasive. The state's theory played a small role, if any, in the courts' reasoning. In this context <u>Dunn</u> and [<u>Cola v. Reardon</u>, 787 F.2d 681 (1st Cir.), <u>cert. denied</u>, 479 U.S. 930 (1986)] are simply not applicable.

<u>Id.</u> at 238.

Similarly, and more importantly, habeas proceedings are not the appropriate forum for Lambert to pursue claims of error at the PCRA proceeding. As we explained in <u>Hassine v. Zimmerman</u>, 160 F.3d 941 (3d Cir. 1998):

> The federal courts are authorized to provide collateral relief where a petitioner is in state custody or under a federal sentence imposed in violation of the Constitution or the laws or treaties of the United States. 28 U.S.C. §§ 2254, 2255. Thus, the federal role in reviewing an application for habeas corpus is limited to evaluating what occurred in the state or federal proceedings that actually led

41

to the petitioner's conviction; what occurred in the petitioner's collateral proceeding does not enter into the habeas calculation. We have often noted the general proposition that habeas proceedings are "hybrid actions"; they are "independent civil dispositions of completed criminal proceedings." Federal habeas power is "limited . . . to a determination of whether there has been an improper detention by virtue of the state court judgment."

Id. at 954-55 (internal citations omitted); see also Morris v. Cain, 186 F.3d 581, 585 n.6 (5th Cir. 1999); Williams-Bey v. Trickey, 894 F.2d 314, 317 (8th Cir. 1990). To be sure, error in state collateral proceedings may affect the deference we owe the court's findings under § 2254(d) and 2254(e)(1). But, as we admonished in Hassine, alleged errors in collateral proceedings, such as Lambert's claim that the prosecution "switched" the sweatpants, are not a proper basis for habeas relief from the original conviction. It is the original trial that is the "main event" for habeas purposes.

### 2. Evidence of Yunkin's Location During the Murder

Prior to the trial, an individual named Kathleen Bayan gave a statement to a Commonwealth investigator indicating that she had seen Yunkin driving through the Show condominium complex with two passengers the morning of Show's murder. Lambert argues this evidence shows that the Commonwealth knowingly used perjured testimony, namely Yunkin's testimony that he never drove within the condominium complex that morning. She also argues that the Commonwealth's failure to disclose Bayan's statement prior to the trial violated Brady v. Maryland, 373 U.S. 83 (1963).

The circumstances surrounding Bayan's statement were thoroughly canvassed at the PCRA hearing. Bayan testified that on July 5, 1992, soon before Lambert's trial began, Detective Ronald Savage of the East Lampeter Township Police Department called her to discuss a matter regarding her son. During the conversation, Bayan (who lived in the same condominium complex as Show) told Savage that on December 20, 1991 she had seen a light-haired young man driving with two passengers along the road she lived on within the condominium complex.

Savage visited Bayan two days later to take a statement from her. Bayan told him that as she was pulling out of her driveway on Black Oak Drive, a circular road that passed through the condominium complex, she saw three individuals drive by in a brown car. The passengers were talking and appeared to be in conflict, and the young man driving the car pushed down the head of the person sitting in the front seat. Bayan provided a written statement that provided, in relevant part:

. . . . On pulling out of my drive (at 43 Black Oak Drive) I observed a brown "patchwork coupe" (mid 70's?) That looked like it might be in the Ford/Mercury line. There were three people inside. The person driving appeared to have light hair. And the two passengers had dark clothing. What I remembered was the movement inside the car. One passenger was in the back [and] one in the front. The person in the front leaned over the seat toward the back and arms were moving all over. The driver would turn sideways during this time.

The driver also was going too fast for the curves and was not driving in a straight line. I remember thinking that the car looked out of place in the condominium and that whoever was in it acted drunk for 7 A.M.

I left an extra couple of car lengths between the brown car and mine. It exited The Oaks on Oakview Rd. To the light at 462 then made a right and went straight (?) down 462 (sort of swerving).

From observing glimpses of their faces the people in the car were of High School age or very young adults (16-22).

There were no headlights on, it was dawn and it was light enough to see clearly.

The two passengers had on navy or black tops and I could not see their hair yet it was all dark like their clothing. So I would deduct that it was a hood. The driver was male, but the passengers were not decernable [sic] as either sex.

The car had patches where it may have had primer on it or a try at matching the paint of "coppery brown". It really looked so out of place in our condo.

I am almost positive (99.5%) that I recollect this car passing my cul de sac while I was waiting to pull out. The brown car was moving faster than our residents drive and took the curve at Sycamore Drive sharply. (There is a small chance that the vehicle could have made a U turn at the end of Sycamore Drive

and that is where the car got in front of me. But either way I remember thinking that the driver was not driving safely.)

I had never seen the car in the complex before. There were no other cars pulling out of the complex during this time.

I did not see their faces clearly because of the distance, dirty windows, and I have a perceptual disability that limits my span of focus (i.e. when I look at a license plate and focus on the first letter, I cannot tell what the last 3 figures are). . . .

I would like to apologize for not contacting you all sooner. At first, I did not realize there was a connection. Then when I did, the suspects were arrested [and] from what I read in the papers, there appeared to be enough evidence.

Appellate App. 1613-15. Bayan testified at the PCRA hearing that she accidentally omitted from her statement that she saw the driver push down one of the passenger's heads.

Savage testified that he gave the written statement to John Kenneff and told Kenneff that he believed Bayan was not credible because he thought she had emotional problems. Kenneff sent a letter to Lambert's counsel, Roy Shirk, stating: "It is my understanding that it is the defense contention that on December 20, 1991, shortly after 7:15 a.m., Yunkin picked up Lambert at the wooded area near the intersection of the driveway to the Oaks Apartment Complex and Oakview Road. If my understanding is correct please advise." Appellate App. 1620. Kenneff testified that he sent this letter in order to determine whether he had an obligation to disclose Bayan's statement.

Kenneff knew that Yunkin planned to testify that he picked up Lambert and Buck on Oak View Road—outside the condominium complex—and Bayan's statement was therefore inconsistent with Yunkin's planned testimony. But Kenneff believed, according to his testimony, that he had no obligation to disclose Bayan's statement unless it corroborated the version of events Lambert planned to offer at trial. And all the evidence other than Bayan's statement—including Lambert's statement to the police upon her arrest—indicated that Yunkin had picked Lambert and Buck up outside the condominium complex. As a result, he did not tell Shirk about the statement.

a.    Knowing Use of Perjured Testimony

Lambert's first argument based on Bayan's statement is that since the statement placed Yunkin in the condominium complex and Yunkin testified that he never entered the complex,

44

the government knowingly elicited perjured testimony from Yunkin. Lambert would, in effect, have us find a due process violation anytime a prosecutor elicits testimony that contradicts testimony that the defense elicits. Discrepancy is not enough to prove perjury. There are many reasons testimony may be inconsistent; perjury is only one possible reason.[29] As

we explained above, in order to sustain a claim of constitutional error Lambert must show that Yunkin actually perjured himself and the government knew or should have known of his perjury. These are factual determinations. See, e.g., Ortiz v. Stewart, 149 F.3d 923, 936-37 (9th Cir. 1998) (finding no constitutional violation because of factual finding that testimony was not perjured); United States v. Caballero, 277 F.3d 1235, 1244 (10th Cir. 2002) (finding no constitutional error because of "the absolute lack of evidence to show either the falsity of [the witness's] testimony or the prosecutor's knowledge of false testimony").[30]

The PCRA Court declined to conclude that Yunkin perjured himself because the lion's share of evidence

---

[29] This principle is illustrated by the (perhaps apocryphal) anecdote told about the legendary English barrister—later Lord Chancellor—F.E. Smith. Smith, then a young lawyer, was charged with assault on a police officer arising out of an altercation at Oxford. Defending himself at trial, Smith denied kicking the officer. The prosecutor challenged the inconsistency between Smith's testimony and that of the policeman, asserting Smith was necessarily accusing the latter of perjury.

As related by an observer at trial (John Simon, also a future Lord Chancellor):

> On the contrary, said F.E. sweetly, that is one of five possible explanations.
>
> . . .
>
> One is that *he* is committing perjury; the second is that *I* am committing perjury; the third is that *he* is honestly mistaken; the fourth is that *I* am honestly mistaken; and

---

the fifth is that the two assertions though apparently contradictory can none the less be reconciled.

Viscount Simon, Retrospect 36 (Hutchinson 1952), quoted in John Campbell, F.E. Smith 77 (Pimlico 1991).

[30] In the Supreme Court cases establishing a due process violation for knowing use of perjured testimony, it was undisputed that the testimony at issue was false and the prosecution knew of its falsity. See, e.g., Napue, 360 U.S. at 269. Thus the Supreme Court has not addressed the level of prosecutorial knowledge necessary to constitute a constitutional violation. See Drake v. Portuondo, 321 F.3d 338, 345 (3d Cir. 2003).

45

corroborated Yunkin's testimony. PCRA Decision 175. We conclude that the PCRA's Court's decision was reasonable.

In reaching its conclusion, the PCRA Court considered Lambert's statement to the police upon her arrest, testimony from three condominium complex residents, and Buck's testimony at the PCRA hearing. After the police arrested Lambert the day of Show's murder, she gave a statement consistent with being picked up on Oak View Road. She stated that after leaving Show's apartment she ran through "two fields" and a "patch of woods," stepped in a creek ("like a little runoff"), fell in "the briars," and ended up on someone's backyard. Similarly, three of Show's neighbors (Kleinhaus, Frederick Fry, and Patricia Fry) testified at the trial that they saw two individuals of generally the same build walking in a direction consistent with Lambert and Buck being picked up on Oak View Road.

Buck, who had not ever previously testified in any court proceedings regarding the events of December 20, 1991, testified at the PCRA hearing. Buck related that she and Lambert entered Show's apartment and accosted Show. Although Buck made several inculpatory admissions, she testified that it was Lambert who stabbed Show and slit her throat.[31] In addition, Buck stated that after

---

[31] Because it goes to the reasonableness of Judge Stengel's factual determination, we note his conclusion regarding Buck's credibility:

> Ms. Buck has nothing to gain by lying about Ms. Lambert's involvement in the death of Laurie Show. In her testimony at the PCRA, she had the candor and the decency to accept responsibility for her own role in the killing. She knows that she blocked Laurie Show's path as Laurie tried to escape. She knows that she held Laurie's legs down while Ms. Lambert cut her throat. In our close observation of Ms. Buck as she testified and in our subsequent consideration of her testimony, we find her credible in her description of the murder. She has acknowledged that she deserves her sentence because of her actions on December 20, 1991. She has acknowledged her guilt under oath in a courtroom in the same courthouse in which her own PCRA petition is pending. What possible impact will this admission have on her own PCRA claim that her trial resulted in a "fundamentally unfair" conviction?

46

she and Lambert left Show's apartment they proceeded toward a wooded area, walked across a field, and ended up in "some bushes, maybe a ditch" along Oak View Road. App. 10426-27.

Furthermore, the PCRA Court found that Bayan was not a credible witness. The Court came to that conclusion for several reasons. Bayan did not come forward with her statement until several months after the murder, for example, and she only told Savage about her observations after engaging in lengthy and seemingly irrelevant discussions regarding

> Ms. Buck knows full well that, when she took the stand to acknowledge, under oath in a courtroom, that she actively participated in the killing of Laurie Show, she severely compromised any chance that she has that a state or federal court will be inclined to find that she has been wrongly convicted. Her testimony will not take a day off her life sentence and will not change the events of December 20, 1991. We find her credible in her description of what happened that morning.

PCRA Decision 159-60.

her personal life.[32] In addition, the PCRA Court allowed Bayan to testify from Florida via teleconference because she told the Court she needed to care for her handicapped fiancé. Yet the Court subsequently learned that there was an active warrant for her arrest in Lancaster County for her failure to pay taxes. The Court also found that Bayan's perceptual disability rendered her testimony questionable.[33] Finally, Judge Stengel concluded that his personal observation of Bayan while she testified via teleconference was consistent with Savage's impression in 1992 that she was not credible.

Lambert argues that the PCRA Court's factual determination was

---

[32] Similarly, Bayan's 1992 statement provided a substantial amount of information, regarding her son, that was irrelevant to her account of what she allegedly saw on December 20, 1991. When the Commonwealth inquired about this at the PCRA hearing, Bayan stated that she "was going through a lot with [her son] at the time" and wanted Savage "to realize where I was coming from." App. 8162.

[33] When Bayan focuses on a particular object, she has difficulty focusing on and seeing the items that surround that object. So, for example, if she is "looking at one word, everything else around it just isn't clear." App. 8169. As a result, she's "a word-by-word reader." Id.

unreasonable in light of other evidence in the record. Lambert Br. 52. Most notably, Hazel Show testified at the PCRA hearing that she recalled driving past Yunkin on her way home the day of the murder and seeing Yunkin pushing down the head of a passenger in the front seat. But she did not recall passing Yunkin until after she heard Bayan testify at the 1997 habeas hearing. At the time of the trial in 1992, she only remembered "a flash of brownish color." App. 9210. She testified at the PCRA hearing about the conversation she had with Savage a couple of days before the trial:

> [Detective Savage] had told me a neighbor lady mentioned that she had seen a brown car leaving our complex.
>
> When he said that, I saw a flash of a brownish color and I said to him, a brownish color? And then we went over this, had I seen a car? I wasn't sure. Where was it? I wasn't sure. What type of car? Was anyone in it? And I had nothing in my memory except when he said this brown color, I just saw a flash of a brown car. Not even knowing if it was a car or anything and I tried to jog my memory to get more information but there wasn't anything there.

App. 9210-11. She became upset when she was not able to jog her memory, and Savage told her not to worry about it because they "had solid witnesses who could answer the questions about the flight that they took, the path that they took from the condo." Id. at 9212.

The PCRA Court found that Hazel Show's recollection did not sufficiently corroborate Bayan's testimony to establish that Yunkin perjured himself. This conclusion was reasonable in light of the full record. First, as the Court noted, Hazel Show could not rule out the possibility that she saw the car on Oak View Road. In addition, Hazel Show did not recollect seeing Yunkin's car until approximately six years after the event occurred. In the intervening time she sat through a trial and habeas hearing where she heard testimony regarding the events she eventually recollected. These facts tend to diminish the value of her testimony at the PCRA hearing regarding seeing Yunkin's car, and they bolster the reasonableness of the PCRA Court's factual determination.

Moreover, even if Hazel Show's testimony sufficiently corroborated Bayan's statement to show that Yunkin's testimony was incorrect, the testimony does not tend to show that the government knew or should have known of the perjury. At the time of the trial, all Hazel Show recalled was a "flash of brown." In light of the substantial evidence supporting Yunkin's testimony and questioning Bayan's credibility, it was reasonable for the PCRA Court to conclude that the government did not and should not have

known Yunkin was perjuring himself (assuming, of course, that Hazel Show's testimony in 1997 and 1998 in fact demonstrated he was lying).[34] The existence of evidence tending to contradict testimony the government elicits at trial does not conclusively show that either the witness perjured himself or (if he did) that the government knew or should have known of the perjury. The PCRA Court's factual findings are dispositive.

b.     Suppression of
       Brady Material

In Brady v. Maryland, the Supreme Court held "that the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. The Court subsequently held that "a defendant's failure to request favorable evidence did not leave the Government free of all obligation," and a Brady violation might arise "where the Government failed to volunteer exculpatory evidence never requested, or requested only in a general way." Kyles v. Whitley, 514 U.S. 419, 433 (1995). In

addition, impeachment evidence, as well as exculpatory evidence, falls within the Brady rule, see Giglio v. United States, 405 U.S. 150, 154 (1972), because "[s]uch evidence is 'evidence favorable to an accused.'" United States v. Bagley, 473 U.S. 667 (1985) (quoting Brady, 373 U.S. at 87). Thus to establish a Brady violation requiring relief, a defendant must show that (1) the government withheld evidence, either willfully or inadvertently; (2) the evidence was favorable, either because it was exculpatory or of impeachment value; and (3) the withheld evidence was material. See Banks v. Dretke, -- U.S. --, 124 S. Ct. 1256, 1272 (2004); United States v. Palermo, 929 F.2d 967, 970 (3d Cir. 1991).

The PCRA Court found that Lambert had not made either of the latter two showings. With respect to the second prerequisite, the Court found that Bayan's statement was not the type of evidence that fell within the government's duty to disclose under Brady. Specifically, the Court held that "[a]bsent a specific request by the defendant for exculpatory evidence, a prosecutor has a duty to make evidence available to the defense that is truly exculpatory rather than merely favorable." PCRA Decision 170. And it found that the evidence was not "truly exculpatory" in part because Lambert's lawyer told the prosecution that Lambert planned to contend at trial that Yunkin had picked her up on Oak View Road. Id. at 171-72. We review this legal determination under § 2254(d)(1) to determine whether it was contrary to or an unreasonable application

---

[34] The PCRA Court did not explicitly make this factual determination, but it is implicit in its findings. And we owe AEDPA deference to both express and implicit factual findings. See Weeks v. Snyder, 219 F.3d 245, 258 (3d Cir. 2000); Campbell v. Vaughn, 209 F.3d 280, 285-86 (3d Cir. 2000).

of clearly established federal law. See Hollman v. Wilson, 158 F.3d 177, 179 (3d Cir. 1998).

This portion of the Court's decision was contrary to federal law, because the Supreme Court has "disavowed any difference between exculpatory and impeachment evidence for Brady purposes." Kyles, 514 U.S. at 433 (citing Bagley, 473 U.S. at 667). Here, as in United States v. Pelullo, "[w]e have no hesitation in concluding that the government inexplicably failed to abide by its obligation under Brady to disclose potential impeachment evidence." 105 F.3d 117, 122 (3d Cir. 1997). While Bayan's statement did not exculpate Lambert, it was inconsistent with Yunkin's testimony regarding his whereabouts during the crime. Bayan could have been called, therefore, to contradict at least one aspect of Yunkin's testimony, and perhaps, therefore, to cast a larger doubt on his credibility. And while Bayan's own credibility might have been open to challenge, resolution of these kinds of credibility disputes should take place in the courtroom, and not through the prosecutor's unilateral decisionmaking.

The PCRA Court concluded, however, that even if the government had erred by not disclosing the evidence, the withheld evidence was not material for Brady purposes. "[A] showing of materiality does not require a demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." Kyles, 514 U.S. at 435. Rather, "[t]he evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Bagley, 473 U.S. at 682.[35] In other words, the relevant question is: "when viewed as a whole and in light of the substance of the prosecution's case, did the government's failure to provide . . . [the] Brady impeachment evidence to the defense prior to the [] trial lead to an untrustworthy guilty verdict . . . ?" See Pelullo, 105 F.3d at 23; see also Banks, 124 S. Ct. at 1276-77.

"Because it is contrary to overwhelming evidence," the PCRA Court held, "her story would have had no impact." PCRA Decision 175. In other words, "it did not so undermine the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." Id. Since this too was a legal determination, we review it also under § 2254(d)(1). We conclude that it was neither contrary to nor an unreasonable application of clearly established federal law.

The potential value of Bayan's statement as impeachment evidence was

---

[35] The Kyles Court also noted that the materiality of "suppressed evidence [is to be] considered collectively, not item-by-item." 514 U.S. at 436. But we need not follow that admonition here since Bayan's statement is the only evidence we find the government wrongfully withheld.

50

negligible. There was substantial evidence at trial, including the testimony of Lambert herself, that tended to show Yunkin picked up Lambert and Buck on Oak View Drive. In any case, there existed far stronger evidence regarding Yunkin's truthfulness (or lack thereof). Indeed, the government conceded in its closing that it believed Yunkin was not fully truthful in his testimony. See App. 1315; supra, at Section IV.C. "Suppressed evidence is not material when it 'merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable.'" United States v. Amiel, 95 F.3d 135, 145 (2d Cir. 1996) (internal citation omitted).

Moreover, the materiality of the statement is negligible even if it would have conclusively established that Yunkin picked up Lambert within the condominium complex instead of on Oak View Road. Assuming that Bayan's statement had that probative value, it would have placed Yunkin somewhat closer to the scene of Show's murder. But despite Lambert's assertions to the contrary, placing Yunkin driving within the condominium complex does not establish that he entered the Show apartment and committed the murder.

Finally, even if evidence showed that Yunkin was *in the apartment*, the evidence was sufficient to conclude that Lambert was guilty of murdering Show. The evidence at trial overwhelmingly showed that Lambert had the motivation (she hated Show), she supplied the murder weapon, and she entered Show's apartment that morning. Thus even if Bayan's statement fully implicated Yunkin in Show's murder, it would not have sufficed to exculpate Lambert. There is no reasonable probability that evidence showing Yunkin was driving within the condominium complex, rather than on a road adjacent to the complex, would have changed the result of the trial.

### 3. The "29 Questions"

As we explained above, when cross-examining Yunkin at trial Lambert's counsel offered into evidence a document that she and Yunkin purportedly passed between each other while they were in jail. Yunkin acknowledged that he and Lambert passed a document between them, but he also testified that the document he was presented with at trial—what we refer to as the "29 Questions"—was not the document that he recalled passing back and forth with Lambert. Yunkin testified that his handwriting appeared on the 29 Questions and some of the questions were the same as he recalled from the document he passed with Lambert, but he claimed that he never saw some of the questions on the 29 Questions document.

As a preliminary matter, we note that Lambert has made much of this document as conclusively establishing her innocence. The trial judge, sitting as a finder of fact, found the document unreliable and inconclusive. As a result, he did not rely on it when he reached his verdict because he concluded that the document did not create reasonable doubt as to Lambert's guilt. After reviewing the

record in some detail, we tend to agree with the trial judge's conclusion. And we find fanciful Lambert's assertion that the only reasonable conclusion from the document is that Yunkin and Buck murdered Show and Lambert was not involved.

Yet our opinion of the probative value of the document is irrelevant. Our role is confined to determining whether any constitutional error occurred at trial. Stripped of Lambert's attempts to retry the case in another forum, her claim regarding the 29 Questions is this: Yunkin's testimony regarding the 29 Questions was perjured and the prosecution knowingly elicited that testimony.

Lambert specifically bases this argument on two portions of Yunkin's testimony. First, Yunkin testified that although the answers written on the 29 Questions appeared to be in his handwriting the 29 Questions was not the document that passed between him and Lambert in prison. He testified that in the document that had passed between him and Lambert, Lambert had written the questions in pencil and he had written all his answers in pencil and then traced over every other word in ink so that they could not be changed. Yet Lambert's expert testified that the questions in the 29 Questions were written in ink, and there was no indication of any writing in pencil on the document. The expert also confirmed that the answers were written in Yunkin's handwriting.

Second, Lambert's counsel asked Yunkin about a portion of the document in which the following question and answer appeared:

> 5) [Question:] I think about Tressa and Laurie! I think you guys are sick! I think about her life you took! All those people at her funeral! And I know very well that you don't feel sad! You were happy, U weren't sad Friday! Do you remember seeing [crossed out word] dead? [Answer:] Yes, I remember seeing [crossed out word] dead."

PCRA Opinion (attached). Yunkin testified that on the document he passed back and forth with Lambert he had responded to a question by answering, "Yes, I remember seeing Tressa dead," because the question he was answering asked, "Do you remember seeing Tressa dead? Do you remember going to her funeral?" App. 329. Yunkin testified that although the 29 Questions was not "the original document," it was his understanding the word crossed out in Question 5 was "Tressa." App. 328-30. But Lambert's expert testified that the crossed-out word was "Laurie."

The PCRA Court found that the prosecution openly conceded to the trial court that it believed Yunkin was not fully truthful in his testimony regarding the 29 Questions. The Court explained:

Mr. Kenneff stipulated to [the testimony of Lambert's expert] on the basis that he had the document examined by a Pennsylvania State Police examiner as well. There was never any effort by the Commonwealth to hide what Mr. Yunkin said or to somehow bolster what Mr. Yunkin said with expert testimony. Mr. Kenneff freely and openly acknowledged that this expert's analysis of the document was consistent with the defense expert and these expert opinions were both inconsistent with Mr. Yunkin's testimony.

PCRA Decision 117-118.[36] The Court's finding of fact was eminently reasonable in light of the record. In particular, Kenneff made the following statement to the Court during closing arguments:

Mr. Yunkin. Is he guilty of the crime of homicide? Fortunately, neither of you have to decide that in this case nor do I have to argue

it. I don't think I held anything back about my feelings about Mr. Yunkin. I said in my openings he's either lying, he's stupid or he's naive. Perhaps the evidence in this case suggests he's all three.

I'm not going to stand here and say that Mr. Yunkin was being truthful about [the 29 Questions]. I can't do that. There is no evidence to do that. What I can say about Mr. Yunkin and what I can say about what Miss Lambert needed to cover up for him is that logic says Yunkin was an accessory before the fact.

App. 1315. Later on in his closing argument Kenneff stated: "Did Yunkin participate in the murder of Laurie? My stomach says he did, my mind says he did. Did he participate in the way that Miss Lambert says? The facts say no." App. 1319.

The PCRA Court's factual finding, supported strongly by the record, precludes a determination that the prosecution knowingly used false evidence to obtain a conviction. It also precludes a finding that "the State, although not soliciting false evidence, allow[ed] it to go uncorrected when it appear[ed]." Napue v. Illinois, 360 U.S. at 269. To the contrary. The government fully and openly informed the Court that it believed Yunkin's testimony

---

[36] The Court also noted: "Mr. Kenneff never hid his belief that Mr. Yunkin was not being forthright about that document. In truth, no one involved in the 1992 trial could quite figure out who wrote what on that document and what it meant." PCRA Decision 120.

53

was not fully truthful. There was no constitutional violation at trial regarding the 29 Questions. The flaws in Yunkin's testimony were fully aired at trial and candidly acknowledged by the prosecution.

Lambert also argues that having conceded that a portion of Yunkin's testimony was questionable, the prosecutor had an ethical obligation to characterize the entirety of testimony as perjury, and to withdraw the witness. These contentions have no merit. A prosecutor fully discharges his obligation when he discloses all inconsistent evidence to the trier of fact and defense counsel. "[W]hile the government has a duty to be forthcoming with favorable evidence, it is not required to draw inferences from that evidence which defense counsel is in an equal position to draw . . . . When the road to what defense counsel think is potential perjury is so plainly marked, the government need not supply a map." United States v. Gaggi, 811 F.2d 47, 59 (2d Cir. 1987). Nor is it true that a witness who fabricates in one area is incompetent to testify about others. This concept is embodied in the common jury instruction known as the "falsus in uno, falsus in omnibus" charge, which provides: "If you find that any witness testified falsely about any material fact, you may disregard all of his testimony, or you may accept such parts of it as you wish to accept and exclude such parts of it as you wish to exclude." United States v. Rockwell, 781 F.2d 985, 988 (3d Cir. 1986) (emphasis omitted).

### 4.    The Crime Scene Photographs

A photograph offered into evidence at Lambert's trial showed Laurie Show lying dead on the floor of her apartment. The photograph showed a telephone cord wrapped once around her leg near her ankle. Lambert contends that there was no telephone cord wrapped around Show's leg before law enforcement authorities became involved with the crime scene. She contends that several hours after Show's body was removed from the crime scene, the police brought the corpse back to the apartment, wrapped a telephone cord around its leg, and photographed the body.

Lambert claims that the police did this in order to discredit the statement she gave to the police upon her arrest. In her statement, Lambert told the police a version of events where "[Show] tried to grab the phone and [Buck] grabbed it away and threw it down." Appellate App. 1577. According to Lambert, the fabricated crime scene photographs showing a telephone cord around Show's leg served to "discredit Lambert's testimony that it was Buck who struggled with Show, and in doing so, threw a telephone across Show's room." Lambert Br. 62.[37]

---

[37] Lambert also argues that the government used the allegedly fabricated photograph "to substantiate the Commonwealth's theory at trial that Ms. Show's legs were tied up and held down as Lisa Lambert slit her throat." Lambert Br. 62-63. We have thoroughly reviewed

Lambert sought to prove to the PCRA Court that this misconduct occurred through alleged inconsistencies between the photograph and (1) a crime-scene drawing, and (2) testimony regarding the crime scene. The PCRA Court flatly rejected this contention, finding that the evidence did not nearly suffice to show that the government engaged in such outrageous conduct. The Court's conclusion was certainly reasonable in light of the record. Indeed, the evidence in the record virtually compelled the Court to reach that conclusion.

Officer Robin Weaver composed the crime scene drawing. The drawing presents a bird's-eye view of the room where Show's body was found and depicts the location of Show's body, furniture, and several miscellaneous objects. The

_____

the record of the trial before Judge Stengel, however, and nowhere have we discovered the Commonwealth urging any such theory. Lambert's characterization of the trial is inexcusable. Lambert cites to a portion of Judge Dalzell's 1997 opinion to support this characterization. But the habeas court's mistaken characterization of the trial record does not give Lambert carte blanche to do the same. Of course, we are puzzled by how Judge Dalzell reached that conclusion (and several others). Perhaps the habeas court simply accepted Lambert's characterization of the trial record. We have learned, from attempting to find support in the record for many of Lambert's claims, that it is perilous to do that.

drawing is inconsistent, in certain respects, with the photographs of the crime. The drawing depicts the telephone cord *near* Show's leg, for example, not touching or wrapped around it as in the photograph. Similarly, the drawing depicts bloody envelopes located closer to Show's body than they appear in the photograph. And the photograph shows objects, such as a coat and an electrical appliance, that do not appear in the drawing. Lambert argues that these inconsistencies—especially the location of the telephone—show that the police fabricated the crime scene photographs.

Officer Weaver testified at the PCRA hearing and explained why the drawing was not entirely consistent with the photographs. Weaver testified that he was told to make a rough sketch of the bedroom floor layout in order to depict the location of evidence the police collected. He did not compose the drawing to scale. Nor did he depict everything that existed in the room, since "[t]here were hundreds of items in the bedroom." App. 4512. In addition, Weaver placed items in the drawing (including the telephone) after Show's body was removed from the room.

Officer Weaver's testimony was sufficient for the PCRA Court to reject Lambert's spurious allegations, but his testimony was not even necessary. We first note that Lambert seriously misrepresents the content of her statement to the police—the statement that allegedly provided the motive to fabricate evidence. She states in her brief that she told the police Buck "threw a telephone across

55

Show's room." Lambert Br. 62. In her actual statement to the police, however, Lambert merely said that Buck grabbed the phone from Show and "threw it down." Appellate App. 1577. This is an important distinction.[38]

And even if Lambert had told the police initially that Buck threw the telephone across the room—which she did not—the crime scene drawing would not support her extraordinary allegations that police returned the body to the crime scene and rearranged it. Lambert apparently contends that if Buck threw the telephone

across the room, it would have been impossible for the phone to end up near Show's body. But the crime scene drawing itself shows the telephone close to Lambert's feet. Thus, on its face, it defeats Lambert's allegations of police misconduct: even if the police thought that evidence showing the phone near Show would have discredited Lambert, there would have been no need for the police to stage a photograph. The drawing accomplishes the same object. Whether or not the cord was *touching* Show's feet is immaterial.[39]

Lambert further argues that testimony from individuals who witnessed the crime scene on the day of Show's murder establishes that the police fabricated the crime scene photographs. Specifically, witnesses testified at the PCRA hearing that they saw Show's feet at the crime scene and a telephone cord was not wrapped around them. In addition, witnesses testified that Show's body lay

---

[38] To be sure, Lambert claimed *at trial* that Buck "threw [the phone] across the room." Appellate App. 631. But Lambert's testimony at trial months later is irrelevant to her allegations that the police doctored evidence to contradict her original statement to the police. What is important, of course, is the content of her statement to the police. The suggestion that officers rearranged the crime scene to anticipate testimony by Lambert that did not occur until months later would a require a finding that the police were clairvoyant.

We are unpersuaded by Lambert's (and her counsel's) attempts to create allegations of misconduct by selectively relying on evidence from various proceedings in Lambert's lengthy route through the criminal justice system: the pre-trial investigation, the 1992 trial, the 1997 habeas hearing, and the 1998 PCRA hearing.

[39] In addition, we agree with the PCRA Court's conclusion that "Ms. Buck's throwing the telephone across the room and the location of the cord around Laurie Show's leg are not mutually exclusive." PCRA Decision. 236. The Court explained: "It appears that the telephone was close to the entrance of the bedroom, by the bed, when Laurie picked it up. If Ms. Buck threw it across the relatively small bedroom, it could easily have landed near the closet where Laurie's body came to rest." Id.

parallel to the closet, while the photograph depicted her body at a slight angle.

Lambert's arguments hinge on an unsupported view of crime scenes as antiseptic and static environments, and an utterly unrealistic supposition about the precision of witness observations and memories. We agree with the PCRA Court's conclusion that "the telephone could have been moved as the several medical and police personnel tended to Laurie or processed the crime scene." PCRA Decision 236. And slight inconsistencies between the body's position in the photograph and witness's recollections (parallel to the closet versus at a slight angle) do not establish an elaborate conspiracy to implicate Lambert in Show's murder.[40]

Finally, Lambert argues that evidence regarding the presence of blood on Show's face shows that the police brought her body back to the crime scene in order to fabricate the photographs. Specifically, the funeral director where Show's body was taken on the afternoon following the murder testified that he removed blood from Show's face when her family came to view her. Yet the autopsy report from the next morning indicated that "much dried blood" was on Show's face. Lambert argues that "[t]he

only possible explanation for this is that the body had been returned to the crime scene after it had been at the funeral home so photos could be fabricated." Lambert Br. 67.

The funeral director certainly testified that he cleaned Show's face when her family came to view her. He stated: "[W]hen I heard that the father and possibly other family members were coming in, I had taken a damp towel and had cleaned up her face and also covered her neck area." Appellate App. 1492. He did not indicate, however, that he removed all the blood from her face. And nothing in his testimony is necessarily inconsistent with the observation at the autopsy the next day that "[m]uch dried blood is seen covering the face and the neck." Appellate App. 1551. Lambert urges us to draw the strongest possible inferences from relatively indecisive evidence and conclude that the police engaged in unconscionable acts of misconduct to fabricate evidence of marginal, if any, utility in implicating Lambert.[41] The PCRA Court understandably declined to do so, and we unhesitatingly defer to its reasonable determination.

### 5. The Dying Declaration

At the trial, Hazel Show testified that Laurie Show said "Michelle did it" as she lay dying in her mother's arms.

[40] We also note that the crime scene drawing depicts Show's body at a slight angle to the closet. Apparently, Lambert feels the drawing is accurate only insofar as it is inconsistent with the photograph.

[41] Indeed, we have come across no portion of the trial record where the Commonwealth used the photograph to discredit any of Lambert's testimony.

Lambert argued at trial that given the injuries Show sustained she could not have said "Michelle did it," either because she had died before Hazel Show returned home or the injury to her neck rendered her unable to speak. Both the prosecution and defense offered expert testimony to support contrary conclusions.

The issue arose again at the PCRA hearing. Lambert argued that expert testimony that was not offered at her trial was "after-discovered evidence" that would warrant relief under Pennsylvania's PCRA statute. Once again, both Lambert and the Commonwealth offered conflicting expert testimony as to whether Show could have said "Michelle did it."

The PCRA Court held that the newly offered expert opinions did not constitute "after discovered evidence," which under Pennsylvania law is evidence that (1) was unavailable at trial, (2) is exculpatory, and (3) would have changed the outcome at trial. PCRA Decision 112 (citing Commonwealth v. Reese, 663 A.2d 206 (Pa. Super. 1995)). After a lengthy discussion of the various expert testimony, the Court concluded:

> No expert has established that it would have been impossible for Laurie Show to speak. In fact, competent and credible expert testimony proves in a clear and convincing way that the dying declaration was possible. No evidence was presented in 1992 or has

been presented in the PCRA hearing which would cause this court to change its finding that Mrs. Show was credible in 1992 when she testified as to her daughter's dying declaration.

PCRA Decision 116.

Now, in her habeas petition, Lambert argues that the Commonwealth's conduct at the PCRA hearing with regard to Show's dying declaration constitutes a constitutional violation warranting habeas relief. Namely, she contends that "[t]he Commonwealth retained new experts in the PCRA proceeding and violated 'the most basic notions of due process,' by proffering new testimony that was based on disowning the very evidence on which it had convicted Lambert in 1992." Lambert Br. 69.

Of course, labeling a claim as a "fundamental due process violation" does not actually substantiate a constitutional claim. Lambert fails to explain how conduct at the PCRA hearing could feasibly warrant habeas relief. Rather, she simply cites three cases: Dunn v. United States, 442 U.S. 100 (1979), Smith v. Groose, 205 F.3d 1045 (8ᵗʰ Cir. 2000), and Thompson v. Calderon, 120 F.2d 1045 (9ᵗʰ Cir. 1997), rev'd on other grounds, 523 U.S. 538 (1998).

Indeed, she cites the same three cases that she contends support her claim that the Commonwealth's "switching" of the sweatpants warrants habeas relief. We have rejected that claim, and we reject her

dying declaration arguments for the same reasons. The Commonwealth did not utilize the allegedly differing expert testimony to convict Lambert (as in Smith/Thompson) or uphold her conviction on direct appeal (as in Dunn). Rather, the state used the new testimony to show that Lambert had not offered after-discovered evidence warranting relief under the PCRA statute. See Gattis, 278 F.3d at 238. And in any case the Commonwealth's conduct at the PCRA hearing is not a basis for habeas relief. [42]

Even if error in the state collateral proceedings could support Lambert's claim for habeas relief, however, none would be warranted here. In contrast to Dunn, Smith, and Thompson, the government did not offer contradictory theories or facts at the trial and the PCRA hearing. The government's theory at both proceedings was that Lambert entered Show's apartment on December 20, 1991 and participated in the murder. At both proceedings they offered Hazel Show's testimony that Laurie Show said "Michelle did it." The government relied on the same evidence—an autopsy report and photographs—at both proceedings. The only inconsistency was in some of the

*opinions* offered by the government's expert witnesses at the trial and PCRA hearing—though they all agreed on the ultimate conclusion that Show could speak the words "Michelle did it"—based on the *same evidence.*

### 6. The DA's Contact with Lambert's Trial Expert

The Commonwealth's district attorney (Kenneff) contacted Lambert's expert, Dr. Mihalakis, over the weekend preceding the trial. Lambert contends that in doing so the Commonwealth violated her right to due process.

Intimidation or threats from the government that dissuade a potential witness from testifying may infringe a defendant's Fourteenth Amendment right to due process and Sixth Amendment right to compulsory process. See Webb v. Texas, 409 U.S. 95 (1972); United States v. Morrison, 535 F.2d 223, 226-27 (3d Cir. 1976); see also United States v. Bieganowski, 313 F.3d 264, 291 (5th Cir. 2002); Newell v. Hanks, 283 F.3d 827, 837 (7th Cir. 2002); United States v. Emuegbunam, 268 F.3d 377, 400 (6th Cir. 2001); United States v. Vega-Figueroa, 234 F.3d 744, 751-52 (1st Cir. 2000); United States v. Vavages, 151 F.3d 1185, 1188 (9th Cir. 1998); United States v. Saunders, 943 F.2d 388, 392 (4th Cir. 1991); United States v. Pinto, 850 F.2d 927, 932 (2d Cir. 1988). In order to violate the Constitution, the government's conduct must have "substantially interfered" with a witnesses's choice to testify. See Bieganowski, 313 F.3d at 291; Newell,

---

[42] In addition, we are doubtful whether Lambert has properly exhausted this claim. This appears to be the first proceeding where she raised this claim. We address it nonetheless because it is meritless and we can therefore dismiss it under 28 U.S.C. § 2254(b)(2). See Gattis, 278 F.3d at 237.

283 F.3d at 837; <u>Emuegbunam</u>, 268 F.3d 377 at 400; <u>Vavages</u>, 151 F.3d at 1188; <u>Saunders</u>, 943 F.2d at 392; <u>Pinto</u>, 850 F.2d at 932.

Whether substantial interference occurred is a factual determination. <u>See</u> <u>Bieganowski</u>, 313 F.3d at 291; <u>Vavages</u>, 151 F.3d at 1188; <u>Pinto</u>, 850 F.2d at 932. On direct appeal we review a district court's determination regarding substantial interference for clear error. Here, we apply the deferential standards of § 2254(d)(2) and § 2254(e)(1).

The issue of Kenneff's contact with Mihalakis came up during the trial. Lambert filed a motion asking the Court to sanction the Commonwealth for Kenneff's pre-trial contact with Lambert's expert witness. Judge Stengel held a hearing in order to decide Lambert's motion.

At the hearing, Kenneff indicated that he was upset upon learning, approximately a week before trial, that Mihalakis was going to testify as a defense witness. Mihalakis was under contract to work as an expert for Lancaster County, and Kenneff felt that as a result he would be unable to discredit Mihalakis at trial. Kenneff contacted Mihalakis even though Lambert's attorney, Roy Shirk, would not give his consent. Kenneff told Mihalakis about his concern, and Mihalakis offered to withdraw if Judge Stengel found that his contract with the County precluded him from acting as an expert for Lambert. Kenneff told him not to withdraw because it would only cause a continuance.

After Judge Stengel heard from Shirk, Kenneff, and Mihalakis, the following colloquy occurred:

> THE COURT: [Y]ou've done your examination and you have your opinions that you are going to state as part of this case, I take it.
>
> DR. MIHALAKIS: Yes. I have a consultative letter.
>
> THE COURT: What is the date of that letter? About when was it written to him?
>
> DR. MIHALAKIS: (Looking at document.) June 29.
>
> THE COURT: All right. And I take it that your testimony would be consistent with that consultative letter.
>
> DR. MIHALAKIS: I would hope so, yes.
>
> THE COURT: Okay. Is there anything about the discussion you had with Mr. Kenneff that causes you to not say what was in that letter?
>
> DR. MIHALAKIS: No, I don't believe so.
>
> THE COURT: Did you feel threatened or intimidated or coerced by that discussion you had with Mr. Kenneff?

60

DR. MIHALAKIS: No, sir, I did not.

THE COURT: Okay.

DR. MIHALAKIS: Okay. Mr. Shirk, are you aware of any rule of professional conduct that prevents an attorney in a criminal case from contacting an expert or a witness who would testify for the other side?

MR SHIRK: No, I'm not.

THE COURT: Are you aware of any such rule?

MR. KENEFF: I'm not aware of a rule.

THE COURT: I'm not aware of any such rule. Okay. Based upon my review of the motion for sanctions before today and before our hearing, this date, and based upon the discussion we've had here on the record in chambers, and the candid and frank comments of Doctor Mihalakis, Mr. Shirk and Mr. Kenneff, I'm going to deny the motion for sanctions.

App. 374-75. The trial court found, in effect, that the government had not substantially interfered with Mihalakis's choice to testify.

The PCRA Court reached the same conclusion after hearing additional evidence on the matter. The Court concluded: "It was arguably improper conduct with some justification under the circumstances. The bottom line is that it did not affect the witness's testimony at trial. He testified consistent with his report and his testimony was no surprise to petitioner's counsel." PCRA Decision 195. The trial court's determination was reasonable given the record before it. Lambert did not adduce evidence at the PCRA hearing that would rebut the trial court's factual finding, and the PCRA Court's determination was reasonable given the evidence before it.

Lambert's trial counsel, Roy Shirk, testified at the PCRA hearing regarding the circumstances surrounding the procurement of Mihalakis as an expert for Lambert. Shirk and Richard Jeffries, a private investigator working for the defense, decided to seek Mihalakis's services to offer an opinion about whether Show could have spoken after the attack. They asked Mihalakis to answer four questions after reviewing a group of relevant materials, including Show's autopsy report and crime scene photographs:

> 1) How long would Laurie Show have lived after the wounds were inflicted?
>
> 2) What wounds were fatal?
>
> 3) Could Laurie Show say anything afterward; could

61

she have said, "Michelle did it"?

4) How many persons were involved in the stabbing, one, two or more? Were they male or female and right or left handed? Any signs of a male person being involved?

Appellate App. 1635. Mihakalis responded that the "neck wounds and the right back wound are fatal wounds," and that Show "could have survived multiple minutes, but I doubt very much whether she could have survived a full half hour." He further opined that Show's wounds "would certainly limit but not totally eliminate phonation, especially words and letters that involve the tongue." Finally, Mihalakis offered an opinion based on the fact that the tip of the knife used to kill Show had broken off. He had taken an identical knife, placed it in a vise, and bent it until it broke. He wrote the following:

> By the time the knife broke, I was exerting considerable force. While such force is not beyond the capability of an average male or female, the fact remains that the knife had to have been wedged someplace in the body, possibly even bony tissue and then bent back in such a way as to break. . . . If it was so deeply wedged in bone, I doubt whether a girl could pull the entire

maneuver of insertion and bending to the point of breakage.

App. 1636.

After reading Mihakalis's report, Shirk determined that it would not be worth hiring Mihalakis because "[q]uite frankly, it wasn't going to help us a lot." App. 6537-38. After speaking with Mihalakis a few times, however, Shirk felt that Mihalakis would be able to offer testimony that would support Lambert's case. Shirk explained:

> I'd like to be very clear on this. He had indicated to me at all times that he would not be able to say, to a degree of medical certainty, that Laurie Show could not talk.
>
> However, he was willing to testify that he believed that she did not. That he didn't think she could have. And the reason he thought she would not have been able to say what she reportedly had said had to do with certain vowels and so on and so forth . . .
>
> Basically I expected from him, and this was not only after one phone call, but it was after, as I indicated, two or three, testimony that he would not say she could not talk, to a degree of medical

62

certainty, but it certainly was his impression, as an expert, that she did not, and that she did not for these reasons, and going into the explanation of the vowels and so on and so forth that would have to have been used to say the words that were purportedly [sic] to have been said.

In addition, I expected testimony from him that he did not believe that a female could have broken off the knife the way it was broken off.

Now, that evolved over a period of, I don't know, a week, a week and a half, or maybe not that long. Several days anyway. Wherein he modified what appears to be here. It was done over the telephone and it was at that time I indicated that I wanted him to testify.

App. 6538-39.

Shirk testified that Kenneff became "angry" and "upset" when Shirk told him that Mihalakis was going to testify for the defense. Kenneff was angry because "the District Attorney's office felt that they had him under contract." And he asked if Shirk would mind if he telephoned Mihalakis. Shirk said he would rather Kenneff not call Mihalakis until after the trial.

Yet Kenneff contacted Mihalakis nonetheless. Mihalakis testified that Kenneff sounded "displeased." Kenneff testified that it was his understanding that Mihalakis could not testify for a defendant because he was under contract to be an expert for the Commonwealth. Mihalakis told Kenneff that he thought he could contract to give his services to whomever he desired. "I express to him that I was surprised he was doing this," Kenneff testified, "I was concerned about our ability to handle this case properly, given his association with us." App. 5089. Mihalakis offered to withdraw as a witness for Lambert "[i]f it was going to complicate future cases," but Kenneff told him not to. App. 5509. They also spoke generally "about the autopsy report and my [Mihalakis's] feelings and whether or not you could enunciate anything." App. 5506.

As described above, Shirk moved for sanctions at trial and Judge Stengel denied Shirk's motion because he found there was no indication that Kenneff's conversation with Mihalakis had intimidated him. Shirk conceded as much at trial, stating to Judge Stengel:

I asked [Mihalakis] quite frankly if this would affect his testimony in any way, shape or form. I think the exact word I used was whether he would pull his punches. He indicated to me he would not.

. . . [H]e indicated to me that in no way, in any

63

way would it affect his testimony Friday. I can honestly say to you at this point there is no way it has a chilling effect. He hadn't been on the stand. I think he's an honorable enough man that it will not have a chilling effect.

App. 369. Yet Shirk testified at the PCRA hearing that he was, in fact, "angry" and "surprised" by the content of Mihalakis's testimony. App. 6540. And he and his co-counsel, Alan Goldberg, decided to get Mihalakis off the stand as soon as possible.

The PRCA Court determined that Mihalakis's testimony was consistent with the report he had provided to the defense, and we agree. Mihalakis testified that "[t]he cause of death is a cutting wound of the throat and a stab wound of the right chest." App. 380. And given her wounds, he testified, it would have taken Show "multiple minutes" but "considerably less than a half hour" to die. App. 386. With respect to Show's ability to say "Michelle did it," Mihalakis testified that "[i]t would have to be affected in part":

> Ma is predominantly a lip sound, and the tongue and lips are controlled by a different set of nerves so the ma sound should not've been affected. If it was affected it was to a minor degree.

The Chael may have been somewhat less clear and the da may have been somewhat less clear.

App. 390. Finally, Goldberg questioned Mihalakis about the tip of the knife that had broken off and whether a woman could have broken the knife. Mihalakis testified that "[t]he function of the break is not gender related, it is strength related, deliberateness related. If someone is strong enough, they could certainly break the knife . . . ." App. 398. Yet he opined that "[w]hile it is not beyond the realm of a woman, it would really make it extremely unlikely, very unlikely." App. 399.

Futhermore, the PCRA Court determined that Shirk had no reason to be surprised by Mihalakis's testimony. Mihalakis expressly stated before Judge Stengel that he would testify consistently with the report and that his conversation with Kenneff would not prevent him from saying "what was in the letter." App. 374. Mihalakis's statement should have disabused Shirk of any notion that Mihalakis might materially depart from his opinions in the report.

To be sure, we do not believe that Kenneff's contact with Mihalakis was entirely appropriate. At the very least, Kenneff displayed a lack of judgment. Yet not every lapse of prosecutorial judgment violates the Constitution. Here, Lambert had to show that Kenneff substantially interfered with Mihalakis's choice to testify. The PCRA Court's conclusion that there was not substantial interference was,

64

given the evidence before it, well within the bounds of reason.

### 7.      The River Search

After receiving information from Yunkin and Lambert regarding their disposal of evidence in the Susquehanna River, law enforcement officials conducted a search of the river on December 21, 1991. The police were specifically looking for "a pink plastic bag containing at least one pair of sneakers." Appellate App. 1561. They found a knife and a pink plastic bag. The police video-taped the search and provided Lambert's counsel with an edited version of the tape.

The police conducted another, more extensive search two days later, on December 23, 1991.    Using a dog "scented" with Buck's sweater, the police found a piece of white nylon rope. The police also found a sneaker. The December 23 search was not video-taped.

The police did not indicate in any reports regarding the river searches that they found a pink bag or a sneaker, nor did they in any way inform Lambert about the finds. A police report provided to Lambert indicated that the rope was found, but it did not indicate that it was found using a dog scented with Buck's sweater.

We discern four arguments of constitutional error from the unstructured discussion of the river searches in Lambert's brief. First, Lambert argues that the government violated Brady by failing to inform her that they found the pink bag and sneaker. Second, she appears to argue that the government knowingly elicited false testimony at the trial that the police never found a pink bag or sneakers. Third, she argues that the government violated Brady by failing to inform Lambert that the rope was found using a dog scented with Buck's sweater. Finally, Lambert appears to argue that the government violated her due process rights by destroying exculpatory evidence (the pink bag and sneaker) prior to trial.

### a.      Brady Violation Concerning the Pink Bag and Sneaker

Again, to make out a Brady violation Lambert must show that (1) the government withheld evidence, either willfully or inadvertently; (2) the evidence was favorable, either because it was exculpatory or of impeachment value; and (3) the withheld evidence was material. See Banks, 124 S. Ct. at 1272. The PCRA Court found that the pink bag was not exculpatory and that, in any case, the police did not withhold the pink bag's discovery from Lambert. With respect to the sneaker, the Court found that it was not exculpatory. Once again, the PCRA Court's determinations were reasonable.[43]

---

[43] Throughout this decision we have found the PCRA Court's factual determinations to be "reasonable," which is the standard that we must apply under AEDPA. We note, however, that

The edited version of the videotape provided to Lambert shows an empty pink bag embedded in ice. Indeed, Lambert's counsel testified at the PCRA hearing that he saw the pink bag in the videotape but did not question police witnesses about it at trial because he "assumed it was a bag that had nothing to do with this case." App. 6461, 6637. The pink bag was therefore disclosed to Lambert. Needless to say (though apparently we must), <u>Brady</u> does not require the government to inform a defendant about information that the defendant possesses. <u>See</u> <u>United States v. Hill</u>, 976 F.2d 132, 136 (3d Cir. 1992); <u>Fullwood v. Lee</u>, 290 F.3d 663, 686 (3d Cir. 2002) ("Certainly . . . information that is not merely available to the defendant but is actually known by the defendant would fall outside of the <u>Brady</u> rule."). Put differently, evidence is not "suppressed" if the defendant knows about it and has it in her possession.

Detective Ronald Barley testified about the sneaker. He estimated that it was approximately a size six or seven sneaker, and it was a white "old type hightop

_____

reasonableness is a continuum. Some determinations might be more or less reasonable than others. Some determinations on the "less reasonable" side of the reasonableness continuum might have been determinations that we would not have made in the first instance but that we must accept under AEDPA. None of the determinations the PCRA Court made, however, fall along that stretch of the continuum.

sneaker with the laces." Appellate App. 1157. More importantly, however, he testified:

> The sneaker was stained brown from being in the mud. And around the sides of the sneakers it had what I would call black rot and threads in that area of black rot were beginning to rot away from the material and I felt that the sneaker was in there for a lot longer than three days to get in that condition.

App. 3466-67. The government need not provide a blanket disclosure to a defendant regarding all evidence found during an investigation. "[T]here is 'no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case.'" <u>Agurs</u>, 427 U.S. at 109 (quoting <u>Moore v. Illinois</u>, 408 U.S. 786, 795 (1992)). If the police had found a rusty Swiss army knife during the river search, for example, it certainly would not have violated <u>Brady</u> if they failed to disclose the find to Lambert. The state does not have an "'obligation to communicate . . . speculative information.'" <u>Id.</u> at 110 n.16 (quoting <u>Giles v. Maryland</u>, 386 U.S. 66, 98 (1967) (Fortas, J., concurring)).

Lambert argues that it was unreasonable for the PCRA Court to credit Barley's PCRA testimony because he "lied about not finding a sneaker or pink bag in 1992" and Lambert did not have the

opportunity to "cross-examine" him at the PCRA hearing. Lambert Br. 89. As we describe below, however, the PCRA Court reasonably found that Barley did not "lie." And, as we explained above, we do not believe that Lambert's inability to ask Barley leading questions obviates the probative value of his testimony.

b. <u>Knowing Use of Perjured Testimony</u>

The following exchange occurred when Lambert's counsel cross-examined Barley at trial:

> Q. How many items were you searching for [at the river]?
>
> A. Specifically, I was looking for sneakers.
>
> Q. All right.
>
> A. We were not sure what else we were looking for.
>
> Q. You were told there were sneakers there?
>
> A. Supposedly, yes.
>
> Q. You weren't told there was a knife and a rope there?
>
> A. No.
>
> Q. Were you told to look for a bag?
>
> A. Yes, another trash bag.
>
> Q. Another trash bag?
>
> A. That's correct.

> Q. Containing sneakers?
>
> A. That's right.
>
> Q. That's all it contained?
>
> A. There was other items; did not know what else was in it.
>
> Q. Did you ever find sneakers?
>
> A. No.
>
> Q. Did you ever find a trash bag?
>
> A. No.

App. 188. Examined in isolation, Barley's testimony that he did not find "sneakers" or "a trash bag" appear to indicate that he did not find *any* trash bag or sneakers. The PCRA Court read Barley's testimony in the context of Shirk's questioning, however, and it concluded that Barley testified that he had not found the pink bag and sneakers that the police *were seeking*.

The Court made this determination in part because Shirk similarly interpreted Barley's testimony. Shirk testified at the PCRA hearing that he did not impeach Barley with the video of the river search, which showed that they found a pink bag, because he felt that the bag in the video was not relevant to the case. As the PCRA Court explained:

> As Mr. Shirk's testimony reveals, it is reasonable to interpret Detective Barley's answer as a denial that a trash bag with evidence in

67

it, i.e., Mr. Yunkin's sneakers, the rope, the knife, two pairs of sunglasses and the hats, was found during the search.

PCRA Decision 217. We agree. Implicit assumptions often underlay conversational exchanges, so that a participant in the exchange can communicate more information than what his words would mean in isolation. See Henry E. Smith, The Language of Property: Form, Context, and Audience, 55 Stan. L. Rev. 1105, 1131 (2003) ("More can be communicated than what is explicitly said, and this can occur by means of conversational implicature.") (citing Paul Grice, Logic and Conversation, in Studies in the Ways of Words 22, 26 (1989)). Here, it was reasonable for the PCRA Court to infer that when Barley responded to Shirk's question he did not mean that he did not find any bags or sneakers at all. Rather, he meant that he did not find bags and sneakers within the parameters of those the police were looking for; but the pink bag he found was embedded in ice and the sneaker was decomposed. It follows from this determination that Barley did not "lie," and the government did not knowingly use perjured testimony.

c.      Brady Violation Concerning the Rope

At the PCRA hearing, Allen Means explained how a bloodhound found the nylon rope after it was "scented" with Buck's sweater. Means, the dog's handler, testified that he called over an individual named John Forwood to come retrieve it. But the police report from the river search, which was provided to Lambert, stated:

> A white sweater worn by def. Tabatha Buck was brought to the scene by myself for use of the bloodhound. . . . The dog was unable to locate any evidence. A foot search was conducted along the banks and wooded areas. At approx. 1045 hrs. John Forwood of W.E.S.T. found white nylon rope on the bank approx. 2 feet south from where the knife was found the previous day.

Appellate App. 1563. Thus, Lambert never learned that the rope was found using a dog scented with Buck's sweater.

The PCRA Court determined that the government did not violate Brady by failing to turn over this evidence because the fact that the dog was scented with Buck's sweater was not exculpatory. Lambert argues that the PCRA Court's determination was erroneous because Buck's scent on the rope was "inconsistent with the Commonwealth's theory of the case (that Lambert killed Show while Buck passively watched)." Lambert Br. 90.

But Lambert mischaracterizes the government's position at trial. We have come across no portion of the trial record where the government contended that Buck "watched passively" while Lambert murdered Show. The government never

disputed that Buck was present in Show's apartment and involved in the murder, and the presence of her scent on the rope neither inculpates nor exculpates Lambert. As the PCRA Court explained, "just because Ms. Buck's scent was on the rope does not mean that Ms. Lambert's was not. There was no testimony that the dog attempted to trace Ms. Lambert's scent and failed. This 'evidence' that Ms. Buck's scent was on the rope does not exculpate Ms. Lambert." PCRA Decision 141. We agree. The PCRA Court's determination was not contrary to or an unreasonable interpretation of federal law.

#### d.      Destruction of Evidence

Lambert appears to argue that the government violated the Constitution by failing to preserve the pink bag and sneaker. The Supreme Court's decisions in California v. Trombetta, 467 U.S. 485 (1984) and Arizona v. Youngblood, 488 U.S. 51 (1988) establish standards for determining whether the government has infringed on a defendant's due process rights by failing to preserve evidence. See United States v. Ramos, 17 F.3d 65, 69 (3d Cir. 1994). Of relevance here is the requirement of bad faith on the part of the government. In Youngblood, the Supreme Court held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." Youngblood, 488 U.S. at 58; see also United States v. Stevens, 935 F.2d 1380, 1387 (3d Cir. 1991).

The PCRA Court determined that Barley discarded the sneaker because he felt that, given its decomposed state, it could not have been Yunkin's sneaker. Other than spurious allegations and shadowy conspiracy theories, Lambert offers no evidence that suggests Barley acted in bad faith.

## IV.    CONCLUSION

After thoroughly examining Lambert's claims, we find no merit in them. To be sure, the Commonwealth should have turned over Bayan's statement to the defense prior to trial and we do not endorse the prosecution's pre-trial contact with Lambert's expert. But neither flaw warrants habeas relief.[44]

There lurks in the background of this decision the fact that one federal district judge -- Judge Dalzell -- found Lambert "actually innocent" and characterized the government's conduct as "the worst case of prosecutorial misconduct in English-speaking experience." Lambert v. Blackwell, 205 F.R.D. 180, 182 (E.D. Pa. 2002). After a comprehensive review of the record, we conclude that these findings are wholly insupportable.

---

[44]    We also reject Lambert's argument that the writ should be granted based on the "cumulative effect" of the alleged constitutional violations. The few errors we have identified, taken together, had no material effect on the trial.

The writ of habeas corpus, as implemented by the statute, empowers a federal court to overturn a state conviction only when it is contrary to federal law or an unreasonable application of law or determination of the facts. Comity and finality, as embodied in the statute and emphasized by the Supreme Court, mandate considerable deference to the determination of the state fact-finder and appellate courts.

Regrettably, the initial habeas decision here upended these fundamental principles of comity and finality. In concluding that Lambert was actually innocent and that her prosecutors were guilty of horrendous misconduct, Judge Dalzell effectively permitted Lambert to retry the criminal case -- with hindsight -- in a federal courtroom. Judge Dalzell's initial opinion reversed the traditional approach to reviewing convictions, see Glasser v. United States, 315 U.S. 60, 80 (1942) (every inference in favor of verdict); he effectively drew every inference *against* the verdict, and accepted Lambert's view that every discrepancy between her version and the state's established that the state was acting in bad faith. As a consequence, the first habeas decision treated every dispute in testimony as state perjury, and every minor inconsistency as momentous. The costs of this misguided approach in terms of comity and finality are very substantial.

By contrast, the decision of the second District Judge -- Judge Brody -- properly weighed the evidence and applied the law under the principles of federalism and finality mandated by the statute. We agree with Judge Brody that Lisa Michelle Lambert was not "actually innocent," and was not the victim of a miscarriage of justice or gross prosecutorial misconduct. A careful, dispassionate review of the entire record convincingly demonstrates that Lambert's trial was fair, constitutionally correct, and well-supported by the evidence. Accordingly, there is no reason to disturb the conviction. We will affirm Judge Brody's denial of the writ.